**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Rev. Dr. Thomas A. Summers, | ) | C/A NO. 3:08-2265-CMC |
| Rev. Dr. Robert M. Knight, | ) | |
| Rabbi Sanford T. Marcus, Rev. Dr. | ) | **AMENDED MEMORANDUM OPINION** |
| Neal Jones, Hindu American Foundation, | ) | **ON PLAINTIFFS' MOTION FOR** |
| and American-Arab Anti-Discrimination | ) | **PRELIMINARY INJUNCTION** |
| Committee, | ) | (Amending note 18 and text accompanying |
| | ) | note 24 as requested in consent motion. *See* |
| Plaintiffs, | ) | Dkt. Nos. 57 and 57-2.) |
| v. | ) | |
| | ) | |
| Marcia S. Adams, in her official capacity | ) | |
| as the Director of Motor Vehicles; Jon | ) | |
| Ozmint, in his official capacity as the | ) | |
| Director of the Department of Corrections | ) | |
| of South Carolina, | ) | |
| | ) | |
| Defendants. | ) | |

This matter came before the court on December 11, 2008, for oral argument on Plaintiffs'

motion for preliminary injunction prohibiting distribution of the "I Believe" license plate pending

resolution of this matter on the merits. By order entered that same day, the court granted Plaintiffs'

motion and indicated that it would issue a separate memorandum opinion setting forth its reasons

for the decision no later than December 15, 2008. The court now issues its supporting memorandum

opinion.

**I. Background**

On April 24, 2008, two members of the South Carolina legislature introduced a bill in the

General Assembly to authorize the "I Believe" license plate, a special license plate with the phrase

"I Believe" and the image of a cross superimposed on a stained glass window. On May 22, 2008,

the General Assembly unanimously approved the legislation and on June 5, 2008, the bill became

law without the Governor's signature. Act No. 253 (to be codified at S.C. Code § 56-3-10110). The

"I Believe" license plate statute (the "'I Believe' Act")  reads as follows:

> The Department of Motor Vehicles may issue "I Believe" special motor
> vehicle license plates to owners of private motor vehicles registered in their
> names. The plate must contain the words "I Believe" and a cross
> superimposed on a stained glass window. The biennial fee for this special
> license plate is the same as the fee provided in Article 5, Chapter 3 of this
> title. The guidelines for the production of this special license plate must meet
> the requirements contained in Section 56-3-8100.

Section 56-3-8100 provides the guidelines for the Department of Motor Vehicles ("DMV")

to follow after the General Assembly approves a special license plate.  In part, Section 56-3-8100

provides that:

> (A) Before the Department of Motor Vehicles produces and distributes a
> special license plate created by the General Assembly after January 1, 2006,
> it *must receive*:
>
>> (1) four hundred prepaid applications for the special license plate or
>> four thousand dollars from the individual or organization seeking
>> issuance of the license plate;
>>
>> (2) a plan to market the sale of the special license plate which must
>> be approved by the department; and
>>
>> (3) the emblem, a seal, or other symbol to be used for the plate and,
>> if necessary, written authorization for the department to use a logo,
>> trademark, or design that is copyrighted or registered. If the
>> individual or organization seeking issuance of the plate submits four
>> thousand dollars, the Comptroller General shall place that money
>> into a restricted account to be used by the department to defray the
>> initial cost of producing the special license plate.

*Id.* (emphasis added).

Section 56-3-8100 also provides that "[t]he fee for all special license plates created by the

General Assembly after January 1, 2006, is the regular biennial registration fee set forth in Article

5, Chapter 3 of this title plus an additional fee to be requested by the individual or organization

2

seeking issuance of the plate." The "I Believe"Act, however, did not include an additional fee. Instead, it set the fee for this special plate at the $24 basic fee for state-required license plates.

South Carolina Governor Mark Sanford allowed the statute authorizing the "I Believe" license plate to become law without his signature, but issued a non-signing statement criticizing the legislature for (1) "enter[ing] into the license plate creation business" and (2) "fail[ing] to designate an organization to be the recipient of any additional fees to be created by the Department of Motor Vehicles." The Governor directed the DMV to set the "I Believe" license plate price at an "amount that will cover the entire cost of producing and administering the new plates." The DMV followed the Governor's directive and set a premium of $5 above the standard fee to defray the plate's production costs.

A DMV employee thereafter created a design for the plate including a cross superimposed on a stained glass window. On October 30, 2008, the DMV posted the "I Believe" special plate on its website and began taking orders from the public.

On November 3, 2008, the DMV announced that it had received the necessary 400 prepaid applications and would begin production of the special plate.

## II. Complaint

Plaintiffs, religious leaders and non-profit religious-cultural organizations, filed this action on June 19, 2008, challenging the constitutionality of the "I Believe" Act. Plaintiffs allege that the Act violates the First Amendment to the United States Constitution in two respects:

1.    First, the Act violates the Establishment Clause because it constitutes government action that advances, endorses, and/or promotes religion; and

2. Second, the Act abridges free speech because it constitutes viewpoint discrimination through the state's creation of a license plate forum that advances (a) one religious viewpoint (Christianity) and (b) religion over non-religion.[1]

Based on these allegations, Plaintiffs seek a declaratory judgment that the statute is unconstitutional and an injunction to prevent production and distribution of the license plate.

## III. South Carolina License Plate Requirements

South Carolina law requires that motor vehicles be registered and licensed by the DMV. Vehicle owners must pay a biennial registration fee, which is typically $24. Owners who pay the standard registration fee receive the standard-issue plate which is currently imprinted with the image of a dark blue palmetto tree and a crescent moon silhouetted against an orange sunrise and the words "Travel2SC.com." Motorists may, alternatively, obtain a special license plate, which generally requires an additional fee[2] and, in some instances, special qualifications. There are two ways in which special license plates are created:[3]

- The South Carolina Legislature may authorize additional license plate options by statute; and

---

[1] Plaintiffs filed a motion for leave to file a second amended complaint two days before the hearing on the motion for preliminary injunction. Plaintiffs allege, as part of their viewpoint discrimination claim, that "the legislative process for enacting specialty license plates impermissibly vests legislators with unbridled discretion and subjects to majoritarian vote the availability of access to the specialty-license-plate forum." Dkt. No. 50-2 at 23. This allegation was not part of the court's consideration when deciding Plaintiffs' motion for preliminary injunction.

[2] Motorists can obtain one legislatively-authorized special license plate, "In God We Trust," for the same $24 price as the standard-issue plate. S.C. Code Ann. § 56-3-9200.

[3] Individuals also have the option of ordering a so-called vanity plate with a unique combination of letters and/or numbers. Vanity plates are governed by a set of special rules, including that they are limited to seven characters, and cost an additional $30 above the basic registration fee of $24. *See* S.C. Code Ann. § 56-3-2010.

• The DMV may approve a license plate upon application of a qualifying organization or institution. S.C. Code Ann. § 56-3-3710 (college or university license plates); *id.* § 56-3-7750 (fraternity and sorority license plates); *id.* § 56-3-8000 (non-profit organization license plates).

These two routes are discussed below.

**A. Legislative Process**

<u>Step 1 - Legislation</u> - The General Assembly may authorize special license plates by statute. A statute to create a special plate is adopted in the same manner as any other legislation.[4]

a. Design Limitations - The General Assembly has not placed any particular design limitations on itself when creating special license plates. *See generally* S.C. Code Ann. § 56-3-8100 (describes the requirements that apply to special license plates created by the General Assembly after Jan. 1, 2006). Therefore, legislatively-authorized special plates may have mottos or statements on them, in addition to images and symbols without size or placement restrictions.

b. Qualifications - The General Assembly sometimes limits special plates to certain qualifying individuals. For example, to receive a Purple Heart or Medal of Honor plate, a vehicle owner must provide proof that he or she received the underlying military award. S.C. Code Ann. § 56-3-3310. Only members of the Lions Club may obtain the Lions Club special license plate. S.C. Code Ann. § 56-3-8400. However, not all of the legislatively-created license plates have membership or qualification requirements. Some of them, such as the "First in Golf" or "In God We Trust" plate, are available to all motorists.

---

[4] In this case, the "I Believe" Act was introduced in the Senate and passed the Senate without reference to committee. In the House, the bill went to the House Committee on Education and Public Works.

Step 2 - DMV Implementation - After the General Assembly authorizes a special plate by statute, the DMV must receive 400 prepaid applications for the special plate or $4000 from a sponsoring individual or organization before it can produce and distribute the plate. S.C. Code Ann. § 56-3-8100. The DMV must also receive and approve a marketing plan before production. If the plate is to include an emblem, seal, or other symbol of a sponsoring entity, that also must be provided by the sponsoring entity, along with appropriate permission to reproduce it. *Id.*

**B. DMV Approval Process[5]**

The DMV is authorized by statute to issue special license plates to owners of private passenger motor vehicles.[6] The DMV has also adopted policies concerning issuance of special plates. DMV Policy RG-504. The combined requirements of the statute and DMV Policy RG-504 are summarized below.

Step 1 - Application - At least five years before applying for an organizational special plate, an organization must incorporate with a state and apply for and obtain tax-exempt status with the Internal Revenue Service as a 501(c)(3), 501(c)(7), or 501(c)(8) organization. An organization must maintain its non-profit status for a minimum of five years before submitting an application for approval of an organizational license plate. A complete application includes a request on the sponsoring organization's letterhead; a completed DMV Form RG-504(a) and 504(d); written

---

[5] For present purposes, the court assumes two distinct processes to create special license plates: the legislative process and the DMV process. It is, however, clear that since September 7, 2006, even the DMV process is subject to final legislative review. *See infra* pp. 8-9 (Step 4 - Appeal Process). Thus, it is arguable that while there are two distinct routes, both are ultimately legislative.

[6] The statute authorizing the DMV to approve and produce special license plates for non-profit organizations, S.C. Ann. § 56-3-8000, has been amended multiple times since it was initially adopted in 1999. For ease of reference, the current and prior versions are attached as an addendum ("Addendum").

6

authorization for use of any copyrighted or registered logo, trademark, or design; license plate artwork on a CD and one color hard copy of the design;[7] a detailed marketing plan; and a designation of the requested fee amount for the special license plate.[8]  In addition to the application, a non-profit organization must include documentation of its tax-exempt status and copies of its tax returns for the last five years.[9]

Step 2 - Design Review Process - After the DMV receives an application, it is reviewed by the "Special Plate Review Panel," which is comprised of members appointed by the Director of the DMV.  The Review Panel must ensure that the proposed design meets all of the agency's design specifications, including that the plate design not include slogans, names, or other text, unless the text appears within the sponsoring organization's emblem, seal, logo, or other representative symbol.[10]  Furthermore, the design must be deemed "appropriate" by the Panel.  This requires, at the

---

[7]  The General Assembly has set design limitations on DMV-approved special plates.  The DMV can only approve emblems, seals, or other symbols that the DMV "considers appropriate of an organization."  S.C. Code Ann. § 56-3-8000(A).  DMV-issued license plates cannot contain mottos that are not part of an organization's emblem, seal, or symbol.  An organizational graphic is limited to an area on the left side of the plate and may be no more than 3.0 inches wide and 3.6 inches high.  *See* Dkt. No. 48-2 (Supplement to Ex. 3 to Pls.' Br. Prelim. Inj.).

[8]  Most special plates cost more than the $24 standard-issue plate.  This is because the organization requesting a non-profit organizational license plate may request a fee in excess of the $24 registration fee.  S.C. Code Ann. § 56-3-8000(A).  The additional fee may be directed to the organization.  *Id.*

[9]  Historically, DMV-approved organizational plates were only available to certified members of the applicant organization.  In 2006, the legislature modified the governing statute to allow non-profit organizations to make their plates available to non-members.  S.C. Code Ann. § 56-3-8000.

[10]  Defendants maintain that a special plate may contain both an "emblem, seal, logo, or other representative symbol" and any text that appears within it.  As an example, Defendants direct the court to the "Choose Life SC" plate that contains the organization's logo as well as the name "Choose Life SC" across the top of the plate.  However, the plain language of the policy suggests words cannot be extracted from a logo to be placed elsewhere on the plate.  *See infra* note 14.

least, that it may not be "offensive" and must meet "community standards of propriety." Policy RG-504. The DMV can disapprove a special plate for a variety of reasons, including that the plate is "controversial, . . . or [subject to] litigation in other states," "partisan," or "potentially offensive, controversial, or inappropriate to the public." *Id*.

Step 3 - Approval Options - The Panel can approve, conditionally approve, or reject the design. If the Panel approves the design, the DMV produces two sample plates to be forwarded to the Highway Patrol. After approval by the Highway Patrol, the DMV's Chief of Staff and Director must also review and approve the design. If the proposed license plate successfully passes the multiple levels of review, the organization is notified. If the plate is conditionally approved, that is approved with suggested modifications, the Chief of Staff and Director must review and approve the suggested modifications. The organization is notified about the suggested modifications and given the opportunity to resubmit the design. Alternatively, the organization may appeal the decision. If the Panel rejects the design, and the Chief of Staff and Director agree with the rejection, the organization is notified and may submit a new design or appeal.

Step 4 - Appeal Process - If the organization chooses to appeal the DMV's decision, the appeal is directed to a legislative review committee. The legislative review committee may overrule any DMV decision to approve or reject a special plate, including decisions that are not appealed by a sponsoring organization. Furthermore, the legislative review committee may review existing special plates and direct the DMV to end production of a plate it "deems offensive or that fails to meet community standards." S.C. Code Ann. § 56-3-8000 (amended in 2006 to create a legislative committee to oversee the DMV's approval of special organizational license plates). Therefore, all special plates are subject to final approval by the legislative committee.

8

<u>Step 5 - DMV Implementation</u> - Just like the legislatively-authorized license plates, the DMV-approved special license plates must receive 400 prepaid applications or $4000 from the sponsoring organization before the DMV can produce and distribute the plate.  S.C. Code Ann. § 56-3-8000.  The DMV must also receive and approve the design and marketing plan before production.  *Id.*

## IV. Standing

Before exercising jurisdiction over this matter, the court must assure itself that the action satisfies Article III's case or controversy requirements.  U.S. Const. art. III, §2.  Defendants assert that these requirements are not satisfied because Plaintiffs lack standing.  Once standing is challenged, the burden shifts to Plaintiffs to establish that they are proper parties, entitled to review of the challenged statute.

The Supreme Court has identified three constitutional standing requirements: a plaintiff must allege that (1) he or she has suffered an injury or will imminently suffer an injury; (2) the injury is reasonably connected to the defendant's conduct; and (3) a favorable decision from the federal court will likely redress the injury.  *See Heckler v. Mathews*, 465 U.S. 728, 738 (1984); *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  As the Supreme Court has explained, plaintiffs raising constitutional challenges satisfy these requirements if they allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness [exists] which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."  *Baker v. Carr*, 369 U.S. 186, 204 (1962).

As the above requirements suggest, standing is an individualized inquiry, which considers each claim and each plaintiff separately.  Nonetheless, because of the common nature of their claims

and alleged injuries, standing may be addressed in subcategories below as to the six Plaintiffs (four individuals[11] and two organizations) in this action.

### A. Individual Standing

#### 1. Establishment Clause Claim

<u>Injury-in-Fact</u> - The Individual Plaintiffs satisfy the first prong of the standing requirements under the Establishment Clause. In *Suhre v. Haywood County*, 131 F.3d 1083 (1997), the Fourth Circuit held that personal contact with a public religious display satisfies the injury-in-fact requirement for standing in Establishment Clause cases. The Individual Plaintiffs in this case are all residents of South Carolina who own motor vehicles registered with the state of South Carolina. They all allege they will be personally and professionally offended when viewing the "I Believe" license plate. As drivers in South Carolina, they will have personal contact with the "I Believe" license plate when viewing other motor vehicles displaying the plate. Furthermore, Plaintiffs will have personal contact with displays of the plate when they visit the DMV's website (which currently has the plate design displayed on its homepage) or one of the DMV's physical branch locations to renew their own license plates. This is sufficient to establish injury-in-fact because the issue is whether the "I Believe" plate constitutes a constitutionally prohibited state-sponsored religious display.

---

[11] The Individual Plaintiffs are Reverend Dr. Thomas A. Summers (a retired United Methodist Church minister), Reverend Dr. Robert M. Knight (pastor at First Christian Church in Charleston, SC), Sanford T. Marcus (Rabbi Emeritus at the Tree of Life Congregation of Columbia, SC), and Reverend Dr. Neal Jones (reverend at the Unitarian Universalist Fellowship of Columbia, SC).

Causation - The second prong, causation, is also established.  It is clear that the injury Plaintiffs allege is caused by the "I Believe" Act and the marketing, distribution, and display of the special license plate.

Redressability - The third prong of the standing requirement is redressability.  Plaintiffs argue that if the court provides injunctive and declaratory relief in this case (or the preliminary relief now sought), the "I Believe" Act will be found unconstitutional and distribution of the "I Believe" license plate will be prohibited (at least temporarily as to the preliminary relief).  Accordingly, Plaintiffs will not be subjected to the personal and professional offense they allege and their injuries will be redressed.

Defendants' sole argument as to Establishment Clause standing relates to redressability. Specifically, Defendants argue that Plaintiffs' injuries will not be redressed if the court declares the statute unconstitutional because a private organization could apply to the DMV for a special license plate with the same design and words as the plate created by the challenged statute.  Thus, according to Defendants, Plaintiffs would ultimately suffer the same injury, albeit through slightly different means.  This argument rests on three related premises: (1) that some as-yet unidentified non-profit group would seek and obtain a substantially similar plate through the DMV-approval process available to non-profit organizations; (2) that a similar plate obtained through the DMV process would not, itself, violate the Establishment Clause; and (3) that legislative authorization of a religious plate is not a redressable injury as long as an equivalent private plate can be obtained through the DMV.  Each of these three premises is subject to challenge.

First, as described earlier, only specified tax-exempt groups may seek a special plate through the DMV.[12]  Among other requirements, these groups must have maintained that status for at least five years prior to the date of application. This limits the groups which might seek approval of a similar plate.

The content of the plate design is also limited as it may include only "an emblem, a seal, logo, or other symbol representative of the sponsoring organization that the Department deems appropriate." DMV Policy RG-504. *See also* S.C. Code Ann. § 56-3-8000. "[S]logans, names, or other text" are prohibited "except if such text appears within the sponsoring organization's emblem, seal, logo, or other representative symbol." *Id.*[13]  Thus, it is questionable whether a design similar to the current design of the "I Believe" license plate (containing *both* the text "I Believe" *and* a symbol consisting of a cross superimposed on a stained glass window) would satisfy these basic design criteria.[14]

---

[12]  Individuals may only apply for a vanity plate.  Such a plate is inherently unique. *See supra* note 3.

[13]  Furthermore, graphics on DMV-approved license plates are limited to a 3" by 3.6" rectangular area whereas graphics on legislatively-authorized plates have no such limitation. *See* Dkt. No. 48-2.

[14]  Defendants direct the court to a "Choose Life SC" license plate that was approved by the DMV after the statute authorizing a "Choose Life" special license plate was held unconstitutional by the Fourth Circuit in *Planned Parenthood of S.C. v. Rose*, 361 F.3d 786 (4th Cir. 2004).  After the *Rose* decision became final, an organization applied to the DMV under a corporate name "South Carolina Citizens for Life, Inc. a/k/a Choose Life SC" seeking approval of a license plate that was almost identical to the plate authorized by the legislature.  The "Choose Life SC" license plate was approved by the DMV and is currently available for sale.

Defendants use that license plate as an example of how a private organization might use a creative name change to avoid the "slogans, names, or other text" prohibition.  The strict language of the DMV policy, however, prohibits inclusion of even a name *except within the "emblem, seal, logo or other representative symbol."*  Assuming this restriction was in place when the "Choose Life SC" plate was adopted, it seems the name must, itself, have been considered part of the logo or

DMV's Policy RG-504 [for] Specialized Plates for Organizations also includes numerous other criteria.  Designs may, for example, be rejected for a variety of reasons including that they are "controversial . . . or [are subject to] litigation in other states."  These concerns might lead the DMV to deny an application for a privately-sponsored "I Believe" plate if, for instance, other Christian groups opposed use of the phrase "I Believe" or their sacred symbols in such a manner or based on the risk of an Establishment Clause legal challenge.

Second, as the DMV's published policy on special plates recognizes, even privately sponsored plates involve state action.

> *Designs displayed on state license plates are approved by the State . . . and are the sole responsibility of the State.*  While the Department can be flexible in considering a range of potential specialty license plates, *the public must also be protected from state action that might be construed as using taxpayer-generated funding to create messages or impressions that are not appropriate for a governmental entity.*

DMV Policy RG-504 (emphasis added).  All state-issued plates are, therefore, subject to *review* under the Establishment Clause.  Whether a plate sponsored by a non-profit religious organization and  approved by the DMV would survive such a challenge is beyond the scope of this action.  It is, however, fair to predict that such a challenge might raise constitutional questions, particularly given that the policies for issuance of such plates may be said to favor established "majority" religions.  *See supra* p. 6-7 ("Step 1 - Application Process").

---

symbol of the organization.  If so, there could be no separate logo or symbol.  Thus, it is not clear that the "Choose Life SC" complies with the current policy, which may or may not have been in effect when that plate was approved.  The existence of the "Choose Life SC" plate does not, therefore, necessarily predict that the DMV would approve a privately-sponsored plate substantially similar to the legislatively-approved "I Believe" plate.

Third, a legislatively-sponsored and authorized religious plate is clearly *more* offensive to the Establishment Clause than a plate sponsored by a non-governmental non-profit organization. This is because legislative authorization signals the state's affirmation, promotion, advancement, and endorsement of the referenced religion (Christianity). This is particularly true in the present case given the General Assembly's initiation and unanimous authorization of an overtly Christian license plate. Furthermore, as of September 2006, even DMV special license plates are subject to legislative veto and, therefore, are essentially legislative.[15]

Irrespective of any speculation as to whether some private organization may later seek DMV approval of a similar plate, whether DMV would approve the plate, and whether such a plate would survive an Establishment Clause challenge, Plaintiffs' claimed injury is the result of the legislature's decision to authorize a special religious license plate in violation of the Establishment Clause. This injury will be immediately redressed if the "I Believe" Act is declared unconstitutional (or, as to the present motion, if a preliminary injunction is issued). Therefore, the court rejects Defendants' redressability argument and finds that the Individual Plaintiffs have standing under the Establishment Clause to challenge the "I Believe" Act.

### 2. Free Speech Claim

<u>Injury-in-Fact</u> - The essence of Plaintiffs' Free Speech claim is that the state has created a special license plate forum and then discriminated against certain viewpoints in that forum. Specifically, Plaintiffs argue that the state gave preferential treatment to a certain Christian

---

[15] In September 2006, § 56-3-8000 was amended to give the legislature final veto power on all DMV special plates. *See* Addendum (2006 S.C. Acts 398). The statute now provides that a legislative review committee may "reverse[] the department's decision . . . [and] may also review all license plates issued by the department and instruct the department to cease issuing or renewing a plate it deems offensive or fails to meet community standards." § 56-3-8000(F).

viewpoint when it legislatively-authorized the "I Believe" license plate without creating a comparable plate for other religions at the same time.

Plaintiffs do not contend that they, or anyone else, ever asked a legislator to introduce a bill for any comparable plate, or sought one through the DMV-approval process. They assert, instead, that pursuit of a similar plate is unnecessary in light of the Fourth Circuit's decision in *Planned Parenthood of S.C. v. Rose*, 361 F.3d 786, 791 (4th Cir. 2004).

The court agrees that *Rose* allows for a finding of injury-in-fact without proof that Plaintiffs pursued approval of a corresponding plate under the alternative DMV process.[16] Such a process would, necessarily, be more onerous and less certain of a positive outcome.[17] For present purposes, the court will also assume that Plaintiffs need not make application to the legislature for legislative authorization of a corresponding plate, at least in the face of proffered evidence that their viewpoint might receive less favorable treatment than the one advanced by the "I Believe" plate.[18]

---

[16] Plaintiffs in *Rose* had unsuccessfully sought amendment of an earlier "Choose Life" license plate bill to authorize a license plate promoting the opposing "Pro Choice" viewpoint. They did not seek approval of a plate through the DMV.

[17] Absent legislative authorization, an organization would have to apply to the DMV and spend its own resources to develop a design, create a marketing plan, advertise the potential special license plate on its own website or through word-of-mouth, and collect the necessary 400 prepaid applications before it would have access to the special license plate forum. The Christian viewpoint was able to bypass this lengthy and cumbersome process through the legislative process.

[18] As noted above (in note 16), the *Rose* Plaintiffs did make an unsuccessful effort to obtain legislative authorization of a plate with an opposing viewpoint. Thus, they indicated some desire for access to the forum. In the present case, Plaintiffs opposed the "I Believe" plate but did not seek to express any "opposing" viewpoint through some alternative plate(s). They have, however, submitted evidence that some legislators would be reluctant to approve similar plates for certain other religious viewpoints. *See* Dkt. Nos. 57 and 57-2 (reflecting agreement by Defendants to admissibility of statements of legislators and the Lieutenant Governor in various newspaper articles, blogs, and websites).

Even with this eased burden, the court finds it unlikely that Plaintiffs can establish that they have suffered an injury-in-fact because they do not allege (or offer any evidence) that any of them *desire access to the special license plate forum* in order to advance an alternative religious (or non-religious) viewpoint. Rather, the essence of Plaintiffs' claim is that religion is an inappropriate subject matter for coverage in the special license plate forum, at least where the plate is initiated by the legislature and approved through the legislative process. In particular, Plaintiffs complain that the legislature has improperly singled out one "favored" viewpoint, Christianity, for promotion. This, however, strikes the court as an Establishment Clause argument, not a Free Speech (viewpoint discrimination) argument.[19] In sum, the court agrees that Plaintiffs do not need to seek approval of an alternative viewpoint plate under the DMV process in order to establish an injury-in-fact for purposes of their Free Speech claim. The court also assumes without deciding that application to the legislature for such a plate is not necessary to establish an injury-in-fact under the circumstances of this case. Nonetheless, the court finds it doubtful that Plaintiffs can establish standing for their viewpoint discrimination claim where they have neither alleged nor proffered evidence that any of them desire or intend to seek access to the relevant forum. *See generally Women's Emergency Network v. Bush*, 323 F.3d 937, 947 (11th Cir. 2003) ("The First Amendment protects the right to speak; it does *not* give [a party] the right to stop others with opposing viewpoints from speaking.") (emphasis in original).[20]

---

[19] In arguing that the differences between the legislative and DMV-approval processes support a finding of injury-in-fact for purposes of their viewpoint discrimination claim, Plaintiffs rely on *Finlator v. Power*s, 902 F.2d 1158, 1162 (4th Cir. 1990). Language within that case recognizes that "an injury is created by the very fact that the [government] imposes additional burdens on the appellants not placed on purchasers of 'Holy Bibles.'" This statement is, however, made in the context of addressing an Establishment Clause and a Free Press claim.

[20] If Plaintiffs were able to establish an injury-in-fact for their Free Speech claim, they would also be able to establish the prongs of causation and redressability for the reasons discussed as to

### B. Organizational Standing

An organization may establish standing based on its own injuries or injuries to its members. *See*, *e.g.*, *United Food and Commercial Workers v. Brown Group*, 517 U.S. 544, 557 (1996). The Organizational Plaintiffs, the Hindu American Foundation and the American-Arab Anti-Discrimination Committee ("Organizational Plaintiffs"), rely on injuries to their members, who include South Carolina residents who are licensed drivers with vehicles registered in South Carolina. When an organization sues on behalf if its members, it must show that (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individuals in the lawsuit. *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 343 (1977).

The Organizational Plaintiffs satisfy all three criteria as to the Establishment Clause claim. First, for the reasons discussed above regarding the injuries of the Individual Plaintiffs, members of these organizations have standing to sue in their own right under the Establishment Clause. Second,  the interests advanced in this action are closely connected to the purposes of the Organizational Plaintiffs which have brought this suit to prevent religious discrimination. Finally, neither the organizations' Establishment Clause claim nor the relief requested require any participation of the individual members of the groups in light of the relief sought (declaratory and injunctive). Therefore, the Organizational Plaintiffs have standing under this claim.

For the reasons discussed above, the Organizational Plaintiffs' members likely would not have standing to pursue a viewpoint discrimination (Free Speech) claim on their own. The Organizational Plaintiffs' standing as to this claim is, accordingly, equally doubtful.

---

standing for purposes of their Establishment Clause claim.

## V.  Preliminary Injunction Standard

Traditional equity principles require that a court consider four factors in determining whether a preliminary injunction should be granted or denied: (1) the likelihood of irreparable harm to the plaintiffs if the preliminary injunction is denied, (2) the likelihood of harm to the defendants if the injunction is granted; (3) the likelihood that the plaintiffs will succeed on the merits; and (4) the public interest. *See Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schs.*, 373 F.3d 589 (4th Cir. 2004) (applying preliminary injunction standard in a First Amendment case); *Safety-Kleen*, *Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 858-59 (4th Cir. 2001); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

The Fourth Circuit requires that a district court consider first the likelihood of irreparable harm to the plaintiffs if the preliminary injunction is denied. *See Safety-Kleen*, 274 F.3d at 859. Plaintiffs must make a "clear showing" that they are likely to suffer irreparable harm if the preliminary injunction is denied. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal quotations omitted). "Generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain [with any accuracy] or are inadequate.'" *Id.* (citing *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)).

After considering the likely irreparable harm to the plaintiffs if the preliminary injunction is denied, the court should consider the likelihood of harm to the defendants if the preliminary injunction is granted. *See Safety-Kleen*, 274 F.3d at 859. The court should then determine whether the balance of harm "tips decidedly in favor of the plaintiff[s]," tips in favor of the defendants, or is about equal. *See Safety-Kleen*, 274 F.3d at 859 (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 195 (4th Cir. 1977)); *see also Direx Israel,* 952 F.2d at 817.

18

If the balance tips decidedly in favor of the plaintiffs, plaintiffs need only raise substantial and difficult questions of a serious nature as to the merits, sufficient to make those questions fair grounds for litigation. *Direx Israel*, 952 F.2d at 812-13. If there is no imbalance of hardship in plaintiffs' favor, then plaintiffs' probability of success assumes real significance and the court should decide whether the plaintiffs have made a strong showing of likelihood of success on the merits or a substantial likelihood of success by clear and convincing evidence. *See Smyth v. Rivero*, 282 F.3d 268, 276 (4th Cir. 2002) (citing and quoting *MicroStrategy, Inc. v. Motorola, Inc*. 245 F.3d 335, 339-40 (4th Cir. 2001)). *See also Direx Israel,* 952 F.2d at 818 (holding that when harms are similar, plaintiffs must make a strong or substantial showing of likelihood of success on the merits).

Once the above factors are considered and resolved, the court must consider whether the public interest favors or disfavors the grant of a preliminary injunction. Ultimately, the court must consider all four factors in deciding whether to grant the requested relief as no single factor is determinative.

## VI. Preliminary Injunction Standard Applied

### A. Irreparable Harm to Plaintiffs

Plaintiffs allege that they will suffer two distinct irreparable injuries if issuance of the "I Believe" plate is not enjoined. First, they allege they will suffer an injury to their rights under the Establishment Clause. Second, they allege they will suffer an injury to their rights under the Free Speech Clause. Either category of loss constitutes an irreparable injury because the loss of First Amendment freedoms, even for a short period of time, constitutes an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury.").

#### 1. Establishment Clause

Plaintiffs' allegations of injury to their rights under the Establishment Clause are adequately pled and supported. These claims are, for example, supported by allegations and affidavits stating that Plaintiffs[21] will be personally exposed to a constitutionally prohibited state endorsement of religion when they view the "I Believe" plate. *See Suhre*, 131 F.3d at 1097 (explaining that personal direct contact with a public religious display is sufficient to establish standing in Establishment Clause cases).

Plaintiffs find such endorsement offensive for a variety of reasons including, as to some of them, that it suggests their chosen religion is less favored than the particular Christian denominations which might approve of and be represented by the "I Believe" plate. Most or all of Plaintiffs' rights under the Establishment Clause are also offended because state endorsement of a specific religion undermines their individual and collective efforts to encourage understanding and acceptance between different religious groups (and non-religious communities). Because any exposure to the plate causes this harm and because the harm is to First Amendment rights, the court finds that the harm would be irreparable.

## 2. Free Speech Clause

Any injury Plaintiffs might suffer as to their rights under the Free Speech Clause would also be irreparable.[22] This is because, presuming any Plaintiff desired equal access to the forum, the delay in obtaining that access (if ultimately obtained through similar legislation) or the increased difficulty

---

[21] In referring to "Plaintiffs" in this section, the court refers to the Individual Plaintiffs and the members of the Organizational Plaintiffs.

[22] As noted above as to standing, the court doubts that Plaintiffs have suffered or will suffer an injury to their rights of Free Expression, for the simple reason that they do not desire access to the forum: license plates in general and legislatively-authorized license plates in particular. Nonetheless, in the interest of presenting a complete opinion for appellate review, the court will address the remaining preliminary injunction factors as to this claim.

and uncertainty of obtaining access (if required to proceed through the alternative DMV process) would be harmful to First Amendment Free Speech rights for reasons discussed in the merits section below. As Defendants acknowledge, in Free Speech cases a determination of likelihood of success on the merits supports a finding of irreparable harm. *See Newsome v. Albemarle County Sch. Bd.*, 354 F.3d 249, 254-55 (4th Cir. 2003).

### B. Harm to Defendants and Balance of Harms

The proposed injunction would preserve the *status quo*, precluding Defendants from further production and distribution of license plates which are alleged to be unconstitutional, until this matter is resolved on the merits. If Defendants were to ultimately succeed on the merits, the resulting delay in distribution would likely have caused some financial injury to the DMV. This is because the DMV would be required to communicate with individuals who have applied for the "I Believe" plate regarding the delay and possibly issue them some form of temporary or alternative license plates.[23]

Defendants *may* also suffer a minimal temporary loss of revenue based on the $5 premium price that the state expects to receive when it sells an "I Believe" license plate. However, the DMV specifically set the premium price at the amount necessary to offset the increased costs of the special plate, and not to generate a profit. Therefore, the state does not expect to generate revenue from the sale of this license plate.

The court, therefore, concludes that the potential harm to Defendants if the preliminary injunction is issued is minor and does not outweigh the inherently irreparable constitutional injuries

---

[23] In the event the "I Believe" Act is ultimately found to be unconstitutional, Defendants will have suffered no cognizable harm from a preliminary injunction because they will have been prohibited from taking illegal action. Moreover, if the court were to deny the injunction and the Act is later found to be unconstitutional, the DMV would be put to the more substantial difficulty of recovering and replacing what, by that time, might be a significantly larger number of plates than the 400 pre-orders that the DMV has currently received.

which Plaintiffs would suffer. The balance of harms, therefore, tips heavily in favor of granting an injunction pending resolution of Plaintiffs' claims on the merits.

### C. Probability of Success on the Merits

Because the balance of hardships tips decidedly in favor of Plaintiffs, the court considers whether Plaintiffs have raised substantial and difficult questions of a serious nature sufficient to make them fair grounds for litigation. For reasons discussed below, the court finds that Plaintiffs have raised such questions and therefore finds a preliminary injunction appropriate to preserve the *status quo*. The court would reach the same ultimate result even if it were to conclude that the balance of hardships was roughly equal or favored Defendants. This is because Plaintiffs have established a strong probability of success on the merits of their Establishment Clause claim.

### 1. Establishment Clause

Plaintiffs allege that the "I Believe" plate violates the Establishment Clause which provides as follows: "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Establishment Clause of the First Amendment prohibits the federal government from establishing a religion in the sense of "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 668 (1970). As further explained by the Supreme Court, "government may not promote or affiliate itself with any religious doctrine or organization." *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989). The Establishment Clause rests on the understanding that "a union of government and religion tends to destroy government and to degrade religion." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

The Establishment Clause applies to the states via the Fourteenth Amendment. *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). State legislatures are, therefore, prohibited from religious

involvement to the same extent as Congress. *Id. See also Brown v. Gilmore*, 258 F.3d 265, 274 (4th Cir. 2001).

Neither party has directed the court to any case addressing the constitutionality of legislatively-authorized (or administratively-approved) religious license plates. There are, however, numerous cases suggesting that government action of a similar nature violates the Establishment Clause. *See, e.g., McCreary County v. ACLU*, 545 U.S. 844 (2005) (holding that Ten Commandment displays in Kentucky courthouses were impermissible endorsement of religion).

In the Fourth Circuit, the three-part test set out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), provides the basic framework for evaluating whether government action violates the Establishment Clause. *See, e.g., Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005); *Koenick v. Felton*, 190 F.3d 259, 265 (4th Cir. 1999). To pass constitutional muster, the *Lemon* test requires that governmental action (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster an excessive government entanglement with religion. *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003). All three prongs of the test must be established for the challenged action to be constitutional. *Lambeth*, 407 F.3d at 269.

Based on the record now before the court, Defendants appear unlikely to be able to satisfy any of the three prongs of the *Lemon* test. First, the plate does not appear to have a secular purpose. There is nothing in the legislative history to suggest anything other than a religious purpose. The very appearance of the plate, with its Christian symbols and images, and the corresponding words "I Believe," suggests a legislative endorsement of Christianity, clearly not a secular purpose. *See Mellen*, 327 F.3d at 373 ("When a state-sponsored activity has an overtly religious character, courts have consistently rejected efforts to assert a secular purpose for that activity.").

Defendants argue that the purpose of the license plate is "to provide South Carolina motorists with another message that they can elect to convey when selecting from over one hundred available specialty license plates." Dkt. No. 39 (Defs.' Resp. Br. Prelim. Inj.) at 29. This claimed purpose is, however, overshadowed by the overtly and singularly religious nature of the legislatively-selected message. Although *any* such message would likely violate the Establishment Clause, the legislature's decision to select a single (majority) religion for such treatment exacerbates the violation. *See County of Allegheny*, 490 U.S. at 600 ("[T]he Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations."). Comments by sponsoring legislators also suggest that they were motivated by a desire to support one specific religion, although several indicated some willingness to consider license plates for a limited number of other religions they deemed appropriate.[24] Thus, Plaintiffs have made a strong showing that the legislation at issue is "'entirely motivated by a purpose to advance religion,'" specifically Christianity. *Lambeth*, 407 F.3d at 270 (quoting *Mellen*, 327 F.3d at 372). The court, therefore, predicts that the "I Believe" Act will fail the first prong of the *Lemon* test.

The second prong of the *Lemon* test requires that the primary effect of the government action neither advance nor inhibit religion. This prong is often referred to as the endorsement test. The "I Believe" Act's primary effect is to promote a specific religion, Christianity. This is true not only

---

[24] According to newspaper reports, State Representative Sandifer was questioned as to whether he would support a license plate for another religion like Islam to which he responded, "Absolutely and positively no." Dkt. No. 34 (Pls.' Br. Prelim. Inj.) at 9. State Senator McGill allegedly told a reporter that Wicca was "not was [he] consider[s] to be a religion." When asked about a license plate for Buddhists, he responded that he would "have to look at the individual situation." *Id*. at 8. State Senator Bryant wrote in his Internet blog that "I guess I'd have to admit I could support a plate for the Jewish community, yet would be very uncomfortable with a plate for scientology." *Id*. at 8-9.

because it has the effect of any other form of "advertising," but, more ominously, because legislative authorization of this plate (and no other religious plate) signals that the referenced religion is uniquely worthy of legislative endorsement. This is clearly prohibited by the Establishment Clause. *See County of Allegheny*, 492 U.S. at 593 (noting that the Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred") (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring in judgment)). As Justice O'Connor explained in her concurring opinion in *Lynch v. Donnelly*: "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).

Defendants' argument that the plate does not signal legislative endorsement of Christianity ignores the "I Believe" Act's legislative history.[25] Two legislators introduced the "I Believe" bill and the remaining members of the General Assembly unanimously approved it. Whether the

---

[25] Defendants argue that the number of special license plates available to South Carolina motorists negates any perceived endorsement because "a reasonable observer would likely recognize the challenged plate as simply one of several different messages that South Carolina drivers can choose to display on their automobiles." Dkt. No. 39 at 31. Even if offering a variety of religious license plates could cure an Establishment Clause violation, the "I Believe" plate is not "one of several" religious plates available. As of the date of this order, there is one other special plate available that can be construed as tied to a specific religion - the Secular Humanists of the Low Country Plate which displays an American Flag and the motto "In Reason We Trust." The connection to the Secular Humanists is not, however, readily apparent on the face of the plate. Only research on the DMV's website reveals the sponsor. Moreover, this special license plate is available only to members of the Secular Humanists of the Low Country. The Secular Humanists license plate was, in any event, approved through the DMV process, not by the General Assembly, and under an earlier version of the DMV's policy which did not prohibit the use of mottos. In addition, the legislature has authorized an "In God We Trust" plate. Although the court is not aware of any legal challenge to that plate, the Supreme Court has recognized that the national motto, "In God We Trust," has lost its religious meaning through overuse and therefore does not violate the Establishment Clause. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 717 (1984) (explaining that "In God We Trust" has lost all significant religious meaning through "rote repetition").

introduction and passage of the bill was at the behest of a religious organization is unknown at this point.[26]  It is, however, apparent that no religious organization was required to navigate that more onerous DMV path toward approval and implementation.

In addition to the indisputable evidence of unanimous legislative authorization of the plate, the court has been presented with a prediction of evidence that at least one other public official has made statements supporting the plate which suggest an endorsement of Christianity.  Lieutenant Governor Andre Bauer states on his official state website that the "'I Believe' plate reflects core values that are meaningful to our society."  Dkt. No. 34 at 9.

Even without knowledge of the history of the "I Believe" Act, a reasonable, objective observer would likely consider that a state-issued license plate carries the endorsement of the state.  The DMV acknowledges this likelihood in its published policy concerning special plates for organizations (Policy RG-504):  "[D]esigns displayed on state license plates are approved by the State for display to all audiences on the public highways and are the sole responsibility of the State."  *See supra* p. 13 (quoting policy in greater length).  Thus, just as a reasonable, objective observer would likely conclude that the state of South Carolina was promoting tourism with the website address "Travel2SC.com" on its standard-issue plate, that same observer could reasonably believe that the state is promoting Christianity through its legislatively-created and DMV-designed and marketed "I Believe" plate.

The final prong of the *Lemon* test requires that government action not foster an excessive government entanglement with religion.  As explained in *Agostini v. Felton*, when evaluating entanglement with religion, courts must consider "'the character and purposes of the institutions that

---

[26]  In his signing statement to the "I Believe" Act, Governor Sanford stated that "many organizations are interested in seeking issuance of this special license plate."

are benefited, the nature of the aid that the state provides, and the resulting relationship between the government and religious authority.'" 521 U.S. 203, 232 (1997) (quoting *Lemon*, 403 U.S. at 615). As *Agostini* suggests, entanglement is harder to describe and evaluate than the other prongs. It is, however, apparent that the "I Believe" license plate itself, and the course on which it must force the legislature to embark, will foster entanglement between the state and one or more religions.

First, the state entangled itself in religion by its very decision to use Christian symbols and references on a license plate. In doing so, the state entered the debate between those Christians who favor actions and displays which proclaim their religion in a very public way and those Christians, like Plaintiffs in this action, who do not. There are, likewise, Christians who disagree with the specific symbols and "motto" selected by the legislature or, alternatively, who find placement of any Christian symbols on a license plate to be debasing of those symbols.[27] *See* Summers Aff. ¶ 9a ("First, these activities place the government's imprimatur on the Christian beliefs the plate expresses, thereby co-opting the religious symbols and beliefs of my faith for the state's benefit, demeaning images and beliefs that are sacred to me."); Knight Aff. ¶ 7a (same). Thus, the legislature has fostered entanglement even considering only the debate between Christians as to the plate which was adopted. *See*, *e.g.*, *Lemon*, 403 U.S. at 619 (holding that state supervision and inspection of the religious content of educational courses constitutes excessive entanglement); *Mellen*, 327 F.3d at 375 (holding that a government drafting of prayer constitutes excessive entanglement); *Hall v. Bradshaw*, 630 F.2d 1018, 1021-22 (4th Cir. 1980) (same).

---

[27] Plaintiffs, who include a retired minister of a United Methodist Church, Rev. Dr. Thomas A. Summers, note the viewpoint advanced is not shared by all Christians. For example, the cross depicted on the license plate is a Latin Cross, used by the Roman Catholic Church, and may not reflect the particular preferences of Presbyterians who use the Presbyterian cross. Likewise, certain Christian groups do not use stained glass. Most critically, not all Christians would agree with the promotion of their religion through a license plate.

The even greater risk of excessive entanglement that will follow adoption of the "I Believe" Act is that the legislature (or DMV) must decide which religions and non-religious philosophies are worthy of a state license plate. Will the legislature or DMV approve a plate advancing or advertising the beliefs just of members of the "major" religions such as Jews, Muslims, Hindus, and Buddhists? What of specific variations or denominations within those religions (Presbyterians, Catholics, Baptists, Unitarians, Shia, Sunni, etc.)? How will the legislature deal with religions the legislators view as controversial such as Wiccan or Scientology? Finally, how will the legislature respond to a request for a plate announcing "There is no god" or "God is dead"?

This is a thicket indeed, and, in the undersigned's view, the type thicket covered by the third prong of the *Lemon* test. Fortunately, it is a thicket from which the legislature is saved by the grace of the Establishment Clause. *See Larson v. Valente,* 456 U.S. 228 (1982) (discussing that when the government begins discriminating between religions, strict scrutiny is triggered, and therefore even facially neutral laws may be invalidated).[28]

For the reasons set forth above, the court concludes that Plaintiffs have a made a strong showing that the "I Believe" Act fails to satisfy any one of the three prongs of the *Lemon* test. As failure on even one prong would support a finding that the legislation violates the Establishment Clause, Plaintiffs have, necessarily, made a particularly strong showing of likelihood of success on the merits as to this claim.

## 2. Free Speech Clause - Viewpoint Discrimination

---

[28] Even assuming the legislature would not violate the Establishment Clause by approving plates for all such groups, religious discrimination concerns would remain absent waiver of the statutorily required 400 prepaid applications for special license plates. This is because minority religions may be unable to obtain the necessary 400 applications.

Plaintiffs also challenge the "I Believe" Act as discrimination on the basis of viewpoint and, therefore, claim that it violates their right to free expression guaranteed under the First Amendment. This claim rests on allegations that the Act advances (a) one religious viewpoint (Christianity) over others and (b) religion over non-religion. It is critical to this claim that the legislature has not authorized license plates advancing other viewpoints on the same subject matter (religion).[29]

As noted above, the court finds it doubtful that the present Plaintiffs have standing to pursue this claim for the simple reason that they do not desire access to the relevant forum but, instead, believe it is an inappropriate forum for religious speech. Nonetheless, the court will address the merits of this claim to provide a complete opinion for appellate review.

The threshold issue in determining whether the "I Believe" Act might give rise to a viewpoint discrimination claim is whether the license plate is purely governmental speech, purely private speech, or hybrid speech. If the speech is pure private or hybrid speech, the state cannot discriminate between viewpoints. *Rose*, 361 F.3d at 798. If the speech is pure government speech, the state is presenting its own message rather than creating a forum and may advocate in favor of its policies without including opposing viewpoints. The government may not, however, suppress opposing viewpoints. *Page v. Lexington County Sch. Dist. One*, 531 F.3d 275, 280 (4th Cir. 2008).

Plaintiffs argue that the plate is hybrid speech (a combination of government and private speech) because it was initiated, adopted, and approved by the General Assembly and is made available as an option for individual vehicle owners to select in order to express their viewpoint. Defendants agree that the plate is hybrid speech, or in the alternative, argue that it is pure

---

[29]  The only other license plate that is remotely comparable is the "In Reason We Trust" license plate approved by the DMV through an application by the Secular Humanists. *See supra* note 25.

government speech. Dkt. No. 39 at 17 (conceding application of *Rose* factors and conceding that they "indicate[] that the challenged speech is not solely the government's own.").[30]

In *Planned Parenthood v. Rose*, 361 F.3d 786, 791 (4th Cir. 2004), the Fourth Circuit concluded that speech on a legislatively-authorized special license plate (which was available as an option to vehicle owners) was hybrid speech. The present license plate was adopted under a similar legislative process.

In *Rose*, the state argued that the prohibition against viewpoint discrimination did not apply because the special license plate was pure government speech. The Fourth Circuit disagreed, concluding that the speech was hybrid. In reaching this conclusion, the Fourth Circuit considered the following four factors: (1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech. *Id.* at 792-93 (internal quotations omitted).

The *Rose* court found that the first two factors, as applied to the challenged "Choose Life" license plate, weighed in favor of government speech because the General Assembly adopted a statute authorizing the special plate and controlled the content and design of the special plate through enactment of the statute. The same is true as to the "I Believe" plate.

In contrast, the *Rose* court further found that the remaining (third and fourth factors) weighed in favor of private speech. Relying on the "Live Free or Die" license plate case in Vermont, *Wooley v. Maynard,* 430 U.S. 705, 717 (1977), the court concluded that "specialty license plates are

---

[30] By conceding that the speech is hybrid, Defendants concede that plates of this nature constitute a forum protected from viewpoint discrimination.

associated at least partly with the vehicle owners." *Rose*, 361 F.3d at 794. The vehicle owner who purchased the plate, therefore, bore the ultimate responsibility for the speech on the "Choose Life" license plate. *Id.* The same is true as to both factors for the "I Believe" plate.

Recognizing that speech cannot always be categorized as purely private or purely governmental, the *Rose* court ultimately concluded that the speech on the "Choose Life" license plate was hybrid speech. *Id.* The same conclusion seems likely as to the "I Believe" license plate given the substantial similarities between the processes by which the "Choose Life" and "I Believe" plates were approved.

Defendants suggest, and the court acknowledges, the possibility that the Fourth Circuit would apply a different *analysis* in light of the Supreme Court's decision in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), which was issued a year after the *Rose* decision.[31] The undersigned does not, however, believe that the Fourth Circuit would reach a different *result* where the decision to purchase the plate at issue is a matter of choice wholly within the discretion of the vehicle owner. *See Turner v. City Council for Fredericksburg*, 534 F.3d 352, 354 (4th Cir. 2008) (In a decision written by retired Justice O'Connor, sitting by designation, the court applied the *Rose* factors when analyzing government speech after *Johanns*.). Rather, the court anticipates that the Fourth Circuit would still conclude that speech contained on the plate was hybrid speech. This is further supported by the Supreme Court's decision in *Wooley* which found an element of private speech even where the vehicle owner had no choice as to the plate to be displayed. Such a result

---

[31] In *Johanns*, private beef producers presented a compelled speech challenge to a mandatory fee that the Department of Agriculture assessed to subsidize an advertising campaign designed to promote beef consumption. *Id.* at 555-56. The Court explained that the government speaks when it (1) "sets the overall message to be communicated" and (2) "approve[s] every word that is disseminated." *Id.* at 562. The Sixth Circuit subsequently held in a license plate case that the *Johanns* test for government speech displaces the Fourth Circuit's four-factor test in *Rose*. *ACLU of Tenn. v. Bredesen*, 441 F.3d 370 (6th Cir. 2006).

seems even more likely where, as here, the state actors take the position that the plate at issue is not governmental endorsement of religion for the very reason that the decision to purchase and display the plate is an individual one.

This court, therefore, concludes preliminarily that the legislatively-authorized "I Believe" license plate involves hybrid speech. It, therefore, creates a forum in which the state might limit the categories of speech, but may not discriminate based on viewpoint. This means, *inter alia*, that the state may not make it more difficult for one group to speak than another. Neither may the state provide one group with a more effective means of advancing its message than another group speaking as to the same subject matter.

The legislative process provided to those who espouse the views advanced by the "I Believe" plate is decidedly easier than and allows for options not available through the DMV process. Those processes cannot, therefore, be considered comparable. Thus, any group forced to seek approval of a religious (or non-religious philosophy) plate through the DMV is disadvantaged in expressing its viewpoint relative to the viewpoint advanced by the "I Believe" plate. Even if the legislature *later* approves other religious plates for those groups which request them, those groups would be disadvantaged by the delay. However, the court concludes that Plaintiffs do not have a likelihood of success on the merits because Plaintiffs likely do not have standing for their Free Speech claim.

### 3. Conclusion as to Merits

For the reasons set forth above, the court concludes that Plaintiffs have made a strong showing of likelihood of success on the merits as to their Establishment Clause claim. Due to a probable lack of standing, the court concludes that Plaintiffs have not made a strong showing of likelihood of success on the merits of their Free Speech Clause claim. Success on either claim, however, would afford Plaintiffs all the relief they seek. Thus, Plaintiffs have made more than an

adequate showing of likelihood of success on the merits to support injunctive relief preserving the *status quo* pending resolution of this action on the merits.

### D. Public Interest

Finally, at the preliminary injunction stage, the public interest must be considered. The public interest weighs in favor of a preliminary injunction for two reasons:

1. The public has an interest in preventing unnecessary administrative costs (and the corresponding burden on motorists who will have to return the license plate to the DMV and register for a new plate) that the state will incur in the event that "I Believe" license plates are issued and the statute is later deemed unconstitutional; and

2. The public has a strong interest in implementation of constitutional legislation. It has an equal interest in avoiding implementation of unconstitutional legislation. The public, therefore, has an interest in preserving the *status quo* to prevent an unnecessary violation of the United States Constitution where there is no urgent need for distribution of the "I Believe" plate before the court can rule on the merits.

### CONCLUSION

For the reasons set forth above, the court grants Plaintiffs' motion for preliminary injunction and directs Defendants to take all actions necessary to preserve the *status quo* pending resolution of this action on the merits. The court orders that Plaintiffs post a bond of one dollar ($1) to be paid immediately.

In furtherance of the injunction, Defendants and all others acting in concert with them or aware of this order are directed to:

(1) Immediately stop advertising the "I Believe" license plate, including, but not limited to, on the DMV's website and at any of the DMV's physical branch locations;

(2) Cease taking orders for the "I Believe" license plate;

(3) Notify the prepaid applicants of the court's order of preliminary injunction and take whatever action is deemed necessary to provide an alternative license plate to those applicants;

(4) Refrain from distributing the "I Believe" license plate; and

(5) Refrain from producing the "I Believe" license plate.


s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 23, 2008