IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Rev. Dr. Thomas A. Summers, | ) | C/A NO. 3:08-2265-CMC |
| Rev. Dr. Robert M. Knight, | ) | |
| Rabbi Sanford T. Marcus, Rev. Dr. | ) | OPINION AND ORDER |
| Neal Jones, Hindu American Foundation, | ) | ON MOTIONS FOR |
| and American-Arab Anti-Discrimination | ) | SUMMARY JUDGMENT |
| Committee, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Marcia S. Adams, in her individual capacity | ) | |
| and in her official capacity as the Director | ) | |
| of the South Carolina Department of Motor | ) | |
| Vehicles; and Jon Ozmint, in his official | ) | |
| capacity as the Director of the Department | ) | |
| of Corrections of South Carolina, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This case presents a textbook example of the need for and continued vitality of the Establishment Clause of the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. The United States Supreme Court has repeatedly warned that "government may not *promote or affiliate itself with* any religious doctrine or organization." *See, e.g.*, *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989) (emphasis added). This limitation on government action is based on the clear understanding of our founders that "a union of government and religion tends to destroy government and to degrade religion." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

Despite such clearly established law, this state's limited resources have been used to promote, pass, and defend a state law, the "I Believe" Act, which authorizes the Department of Motor Vehicles ("the DMV") to issue a license plate which *must* contain "the words 'I Believe' and

a cross superimposed on a stained glass window." S.C. Code Ann. § 56-3-10510. Such a law

amounts to state endorsement not only of religion in general, but of a specific sect in particular. As

Justice Blackmun, speaking for the majority, explained in *Allegheny*:

> Whatever else the Establishment Clause may mean (and we have held it to mean no
> official preference even for religion over nonreligion), . . . it certainly means at the
> very least that government may not demonstrate a preference for one particular sect
> or creed (including a preference for Christianity over other religions). The clearest
> command of the Establishment Clause is that one religious denomination cannot be
> officially preferred over another.

492 U.S. at 605 (internal citations and quotation marks omitted).

Contrary to the arguments of Defendant Marcia S. Adams ("Adams") and Attorney General

Henry McMaster ("Attorney Gen. McMaster"), who appears as *amicus curiae*, the "I Believe" Act

cannot be seen by any reasonable observer either as facilitating expression of a broad diversity of

viewpoints (Adams' argument), or as a permissible accommodation to Christians (Attorney Gen.

McMaster's argument). Both positions are belied by the facts that the "I Believe" Act (1) authorizes

a single plate with a uniquely Christian message, (2) was sponsored and approved solely as the result

of governmental action, and (3) presents its message in a manner that is not available except through

the legislative approval process (necessary to allow the inclusion of both motto and symbol). The

first of these facts precludes a finding of any "context" which would save it from unconstitutionality.

*See Allegheny*, 492 U.S. at 613-21 (Blackmun, J.); 632-37 (O'Connor, J.); *see also id.* at 651

("[D]isplays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt

differences among individuals than to achieve an ecumenical goal. *The Establishment Clause does

not allow public bodies to foment such disagreement.*") (Stevens, J., dissenting in part) (emphasis

added). The latter two facts preclude a finding that the plate is a mere accommodation because they

distinguish the "I Believe" plate from any plate approved or available to private organizations

through the non-legislative process.

The "I Believe" Act had its genesis in Lieutenant Governor Andre Bauer's desire to do here what had been unsuccessful in the state of Florida–to gain legislative approval of a specialty plate promoting the majority religion: Christianity. Whether motivated by sincerely held Christian beliefs or an effort to purchase political capital with religious coin, the result is the same. The statute is clearly unconstitutional and defense of its implementation has embroiled the state in unnecessary (and expensive) litigation.

For the reasons summarized above and addressed in more detail below, the court: (1) grants Plaintiffs' motion for summary judgment as to the claims for declaratory and injunctive relief asserted against Defendants Adams and Ozmint in their official capacities; but (2) finds that qualified immunity bars the claim for damages asserted against Adams in her individual capacity.

## Procedural Background

Plaintiffs include four religious leaders and two non-profit religious-cultural organizations (collectively "Plaintiffs"). In their initial and first amended complaints, Plaintiffs challenged the "I Believe" Act on two grounds. First, they argued that it violates the Establishment Clause of the First Amendment to the United States Constitution (as applied to the states through the Fourteenth Amendment) because it constitutes government action that advances, endorses, or promotes religion. Second, they argued that it violates the Free Speech Clause by providing a forum to Christians to which other religions are not given equal access. *See* Dkt. No. 1 (Complaint); Dkt. No. 9 (First Amended Complaint).[1]

On November 12, 2008, Plaintiffs filed a motion for a preliminary injunction seeking to stop

---

[1] The Free Speech Clause claim was subsequently abandoned. *See* Dkt. Nos. 59, 63, 64, 74 (discussed *infra* n.5).

Defendants from offering, manufacturing, or distributing the plates authorized by the "I Believe" Act. Dkt. No. 34 (motion). The court immediately scheduled a hearing on the motion for December 11, 2008, allowing enough time for complete briefing under the court's normal briefing schedule. *See* Dkt. No. 36, 40 (notices of hearing); Local Civil Rule 7.06, D.S.C. The hearing was held as scheduled following full briefing on the motion. *See* Dkt. Nos. 39 (response filed jointly by both Defendants), 45 (reply), 54 (minute entry for hearing).

At the conclusion of the December 11, 2008 hearing, the court ruled orally, granting Plaintiffs' motion for a preliminary injunction. Dkt. Nos. 54 (minute entry). A written order was issued later that day setting forth the ruling and indicating that a full opinion would follow. Dkt. No. 52. On December 15, 2008, the court issued a memorandum opinion and order ("Opinion"). Dkt. No. 56. The Opinion was amended on December 23, 2008 to correct several points which the parties drew to the court's attention. Dkt. No. 59 ("Amended Opinion"). The Amended Opinion, therefore, stands as this court's final opinion and order addressing the basis for entry of the preliminary injunction.

In the Amended Opinion, the court found that Plaintiffs had satisfied the standing requirements for preliminary injunctive relief as to their Establishment Clause claim. As to the merits of that claim, the court found that Plaintiffs had "made a strong showing that the 'I Believe' Act fails to satisfy any one of the three prongs of the *Lemon* [*v. Kurtzman*, 403 U.S. 602 (1971)] test" and, therefore, have "necessarily, made a particularly strong showing of likelihood of success on the merits as to [their Establishment Clause] claim." *See also* Dkt. No. 59 at 22 (noting Plaintiffs

had established a "strong likelihood of success on the merits of their Establishment Clause claim.").[2]

In contrast, the court expressed doubt that Plaintiffs had standing to assert a claim for violation of the Free Speech Clause given that they did not seek to express their religious (or secular) opinions through the same forum (state-issued plates). Dkt. No. 59 at 14-16. Plaintiffs subsequently stipulated to dismissal of their Free Speech Clause claim and, thereafter, filed a Second Amended Complaint which challenges the "I Believe" Act solely under the Establishment Clause. Dkt. Nos. 64 (stipulation), 74 (Second Amended Complaint).

No appeal was taken from the order granting injunctive relief or the related Amended Opinion. Instead, the matter proceeded through discovery with injunctive relief remaining in effect throughout the pendency of the action. Dkt. No 20.[3]

### Summary Judgment Motions

On August 7, 2009, Plaintiffs, Defendant Adams and Defendant Jon Ozmint ("Ozmint") filed cross motions for summary judgment. *See* Dkt. Nos. 117 (Adams' Motion), 119 (Plaintiffs'

---

[2] In its recent decision in *Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342 (4th Cir. 2009), the Fourth Circuit addressed the preliminary injunction standard in light of *Winter v. Natural Resources Defense Council, Inc.*, __ U.S. __, 129 S. Ct. 365 (2008). 575 F.3d at 345-47. As the court explained, the new standard focuses first on the merits. Because of the nature of the present action, this court also focused on the merits in granting the preliminary injunction. Thus, this court would have reached the same conclusion based on the same reasoning had it applied the standard set forth in *Real Truth* in addressing the motion for a preliminary injunction.

[3] A consent amended scheduling order was entered on October 9, 2008, well before the motion for a preliminary injunction was filed. It set a discovery deadline of April 2, 2009, and allowed an extended period between the close of discovery and the deadline for dispositive motions, the latter being set for July 31, 2009. Dkt. No 20. The discovery and dispositive motions deadlines were later extended on Defendants' motions to June 15, 2009, and August 7, 2009, respectively. *See* Dkt. Nos. 88, 112 (motions); Dkt. Nos. 98, 115 (orders).

Motion), 121 (Ozmint's Motion).  On the same date, Attorney Gen. McMaster filed an *amicus curiae* brief ("*amicus* brief") in support of the Act.[4]  Dkt. No. 118.  The cross motions are now fully briefed and ripe for resolution.

Through their summary judgment motion, Plaintiffs seek the following relief:  (1) a declaratory judgment that the "I Believe" Act violates the Establishment Clause of the First and Fourteenth Amendments to the United States Constitution; (2) a permanent injunction prohibiting Defendants from implementing the "I Believe" Act; (3) nominal damages of $1 against Adams in her individual capacity for violating Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution; (4) the costs of this action, including attorneys' fees, costs, and expenses, under 42 U.S.C. § 1988; and (5) any other relief that the court deems just and proper.  Dkt. No. 119 at 2.

Through her motion, Adams seeks summary judgment both in her official and individual capacities.  In her official capacity, Adams seeks a ruling that the "I Believe" Act does not violate the Establishment Clause.  Attorney Gen. McMaster joins in supporting this argument through his *amicus* brief.  In her individual capacity, Adams seeks rulings that (1) she did not violate Plaintiffs'

---

[4] Attorney Gen. McMaster initially appeared as counsel for both Defendants and remained counsel for both through entry of the preliminary injunction. *E.g.*, Dkt. No. 13 (Answer), Dkt. No. 39 (response to motion for preliminary injunction).  Adams was, during the same period, also represented by four attorneys from the law firm of Nelson Mullins Riley & Scarborough LLP ("NMRS").  *Id.*  After the amended complaint added claims for damages against both Defendants in their individual capacities, attorneys from the law firm of Richardson Plowden & Robinson PA entered an appearance on behalf of Adams and the NMRS attorneys withdrew.  Dkt. Nos. 73 (Feb. 27, 2009 motion to withdraw), 78 (Mar. 13, 2009 answer), 81 (Mar. 19, 2009 order granting motion to withdraw).  Attorney Gen. McMaster withdrew from representation as to both Defendants in March 2009, after the law firm of Davidson Morrison & Lindeman entered an appearance on behalf of Defendant Ozmint.  Dkt. Nos. 79 (Mar. 13, 2009 answer), 84-86 (Mar. 24, 2009 motions and order).  In June 2009, the Attorney General sought and was granted leave to participate as *amicus curiae*.  Dkt. No. 104 (motion), 105 (order).

6

constitutional rights by posting information about the "I Believe" plate on the DMV's website; and (2) even if the posting violated Plaintiffs' constitutional rights, she is entitled to qualified immunity because the underlying rights were not clearly established at the time of the posting.  Dkt. No. 117.

Finally, Ozmint, who is now sued solely in his official capacity,[5] seeks summary judgment on the limited ground that he is not a necessary party.  Ozmint argues that the exception to Eleventh Amendment immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908), does not apply to him because (1) his role is limited to the ministerial function of producing plates and (2) an injunction against Adams in her official capacity is sufficient to secure the complete relief sought by Plaintiffs. Dkt. No. 121-1 at 4.   Consistent with this argument, Ozmint takes no position as to the constitutionality of the statute in his present memoranda.  He did, however, take such a position in his earlier memorandum in opposition to issuance of the preliminary injunction.[6]

After carefully reviewing all submissions for and against summary judgment, the court finds that S.C. Code Ann. § 56-3-10510, the "I Believe" Act, violates the Establishment Clause of the First and Fourteenth Amendments to the United States Constitution by advancing, endorsing, and

---

[5]  Plaintiffs voluntarily dismissed the individual capacity claim asserted against Ozmint. *See* Dkt. Nos. 100 (May 18, 2009 motion to dismiss), 108 (June 12, 2009 order granting motion).

[6]   In an affidavit filed in support of his motion for summary judgment, Ozmint avers as follows: "In my official capacity as SCDC Director, I have not advocated for or against the 'I Believe' plate."  Dkt. No. 121-2 ¶ 7.  This claim may be true outside this litigation.  Ozmint did, however, argue that the "I Believe" Act was constitutional in his memorandum in opposition to a preliminary injunction which he filed jointly with Adams. *See* Dkt. No. 39.  That memorandum also alluded briefly to Ozmint's current position by stating:  "An injunction should also be denied as to Ozmint as the role of his agency is purely ministerial and limited only to the manufacturing of plates under South Carolina Code § 24-3-110.  He and his agency have no role whatsoever in the design or issuance of plates."  Dkt. No. 39 at 3-4.  No further argument on this point was, however, offered in that memorandum, which focused on Defendants' joint argument that the "I Believe" Act does not violate either the Establishment Clause or the Free Speech Clause.

promoting religion.  The court further finds that all forms of relief sought by Plaintiffs, other than damages, are appropriate.[7]

The reasons for these rulings are set forth herein and in the Amended Opinion granting Plaintiffs' motion for a preliminary injunction.  The Amended Opinion is incorporated into this order to the extent it sets forth the factual background (as amended by this order), Dkt. No. 59 at 1-9, and addresses standing for and the merits of Plaintiffs' Establishment Clause claim,  Dkt. No. 59 at 9-17, 22-28.  This order primarily addresses new information and arguments presented in the motions for summary judgment and supporting memoranda.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts."  *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

## FACTS

Although somewhat expanded, the proffered evidence presented for and against summary judgment is, in most respects, the same as offered in support of or in opposition to Plaintiffs' motion for a preliminary injunction.  *Compare* Dkt. No. 59 at 1-9 (Amended Opinion) *with* Dkt. Nos. 117-1 at 2-4 (Adams' statement of additional facts), 119-1 (Plaintiffs' statement of undisputed material

---

[7] This includes a threshold determination that Plaintiffs are entitled to attorneys' fees.  The amount of fees to be allowed is, however, reserved for further briefing pursuant to Fed. R. Civ. P. 54(d) and Local Civil Rule 54.02.

facts).  The parties have, however, presented some additional evidence which will be considered here.  *See* Dkt. Nos. 117-1 at 2-4, 119-1.  The court, therefore, includes a summary of the facts below which focuses on the newly presented evidence.[8]  While additional evidence has been presented which was not previously considered, that evidence does not modify the court's analysis as presented in the Amended Opinion except as expressly noted below.

**Genesis of the "I Believe" Act.**  Prior to the General Assembly's enactment of S.C. Code Ann. § 56-3-10510, no organization had ever applied to the DMV for creation or production of a license plate with the words "I" and "Believe," the image of a cross, or the image of a stained-glass window.[9]  Instead, the impetus for the "I Believe" plate originated in the office of Andre Bauer, Lieutenant Governor of South Carolina ("Lt. Gov. Bauer").  *See* Dkt. No. 119-33 at 18-19.[10]  In his deposition, Lt. Gov. Bauer testified that he and his chief-of-staff, Jim Miles ("Miles"), decided to pursue a law creating an "I Believe" plate for South Carolina motorists after Miles presented Lt. Gov. Bauer with a newspaper article addressing an unsuccessful attempt to create an "I Believe" plate in Florida.  *Id.*  After discussing the idea with Miles, Lt. Gov. Bauer approached Senator Yancey McGill about sponsoring such legislation.  *Id.* at 19.  Lt. Gov. Bauer recalls that he may have participated in drafting the bill, although he was uncertain on this point in his deposition.  *Id.*  In explaining why he promoted the bill, Lt. Gov. Bauer stated that there were then

---

[8]  The court repeats some evidence discussed in the prior order and includes minor references to the procedural history set out above, in order to give context to the "new" evidence.

[9]  DMV subsequently received an application for a plate imprinted with these words and images from a Florida organization but rejected the application because the General Assembly had already created the "I Believe" plate.  Dkt. No. 119-1 at ¶ 89; Dkt. No. 119-23 (request no. 48).

[10]  The excerpt from Lt. Gov Bauer's deposition was filed in condensed (4-to-1) format.  The page references in the court's citations are, therefore, to the page of the actual deposition, not to the page of the docket entry.

9

over a hundred different license plates in South Carolina [which] allow[ed car owners] freedom of expression from a multitude of different activities – to clubs to groups to colleges.  And I thought that if everyone else is allowed that opportunity, *why shouldn't believers in the Christian faith be able to express themselves* – as so many other people have been able to.

*Id.* at 10:21-11:6 (emphasis added).[11]

**Passage of the "I Believe" Act.**  On April 24, 2008, Senators McGill and Larry Grooms introduced the "I Believe" Act in the Senate.  2008 J. of the Senate, 117th Gen. Assem., 2d Sess., (Apr. 24, 2008).  Senator Kevin Bryant was added as a sponsor on April 30, 2008.  2008 J. of the Senate, 117th Gen. Assem., 2d Sess., (Apr. 30, 2008).   The Act provided for a special license plate with the phrase "I Believe" and the image of a cross superimposed on a stained glass window.  The Act passed both the Senate and the House unanimously.[12]  2008 J. of the Senate, 117th Gen. Assem., 2d Sess., (Apr. 30, 2008); 2008 J. of the H.R., 117th Gen. Assem., 2d Sess. (May 21, 2008).

---

[11]  Forty-eight of the license plates to which Lt. Gov. Bauer refers were sponsored by private organizations and approved through the DMV rather than legislative process.  Based on the uncontroverted evidence presented by Plaintiffs,  30 of these refer to educational institutions, five refer to fraternities or sororities, and 13 refer to other nonprofit organizations.  Examples of the organizations represented in the last group include "Choose Life S.C.," "S.C. Cattlemen's Association," "Secular Humanists of the Low Country," and a "West Point" association.  There are 59 legislatively-approved plates available for purchase, four of which serve only an identifying function (*e.g.*, antique, farm vehicle), 18 of which honor military service or specific professions (*e.g.*, firefighters), 19 of which deliver a message of importance to the state (*e.g.*, "In God We Trust" and "First in Golf"), and 18 of which refer to private organizations (*e.g.*, Boy Scouts and Sons of Confederate Veterans).  That these 59 plates were legislatively-approved does not, however, mean that they are legislatively-sponsored in a strict sense, given that the request for the plate may have originated with a private organization.  Indeed, the available means for obtaining approval of a special plate and the specifics of what may be approved have changed substantially over the years, particular with respect to approval through the DMV process.  *See* Amended Opinion at 6 n.6 (noting that DMV was first given authority to approve special plates in 1999 and the authorizing statute has been amended multiple times since its adoption).

[12]  As Lt. Gov. Bauer acknowledged in his deposition, the "unanimity" is of those present. Dkt. No. 119-33 at 12 (noting that, to his knowledge, there was "not any fanfare whatsoever.  It passed . . . without almost any debate" and stating that he did not "know how many people were present the days that it was read").

**Text of the "I Believe" Act and Related Legislation.** The "I Believe" license plate statute

(the "'I Believe' Act") reads as follows:

> The Department of Motor Vehicles may issue "I Believe" special motor vehicle license plates to owners of private motor vehicles registered in their names. The plate must contain the words "I Believe" and a cross superimposed on a stained glass window. The biennial fee for this special license plate is the same as the fee provided in Article 5, Chapter 3 of this title. The guidelines for the production of this special license plate must meet the requirements contained in Section 56-3-8100.

Act No. 253 (codified at S.C. Code Ann. § 56-3-10510).

Section 56-3-8100 provides requirements for the DMV to follow after the General Assembly

creates a special plate. In part, Section 56-3-8100 provides that:

> (A) Before the Department of Motor Vehicles produces and distributes a special license plate created by the General Assembly after January 1, 2006, it *must receive*:

>> (1) four hundred prepaid applications for the special license plate or four thousand dollars from the individual or organization seeking issuance of the license plate;

>> (2) a plan to market the sale of the special license plate which must be approved by the department; and

>> (3) the emblem, a seal, or other symbol to be used for the plate and, if necessary, written authorization for the department to use a logo, trademark, or design that is copyrighted or registered. If the individual or organization seeking issuance of the plate submits four thousand dollars, the Comptroller General shall place that money into a restricted account to be used by the department to defray the initial cost of producing the special license plate.

S.C. Code Ann. § 56-3-8100 (emphasis added).

Section 56-3-8100 also provides that "[t]he fee for all special license plates created by the

General Assembly after January 1, 2006, is the regular biennial registration fee set forth in Article

5, Chapter 3 of this title *plus an additional fee to be requested by the individual or organization*

*seeking issuance of the plate*." *Id.* (emphasis added). The "I Believe"Act was not, however, the

result of any individual or organizational request and, therefore, did not include an additional fee.

11

Instead, the statute set the fee for this special plate at the $24 basic fee for state-required plates.

**Governor's Non-Signing Statement**.  The "I Believe" Act became law on June 5, 2008, without the Governor's signature.  South Carolina Governor Mark Sanford did, however, issue a non-signing statement criticizing the legislature for (1) again "enter[ing] into the license plate creation business" and (2) "fail[ing] to designate an organization to be the recipient of any additional fees to be collected" for this plate.  Dkt. No. 34-6 at 1.  The Governor also directed the DMV to set the "I Believe" plate price at an "amount that will cover the entire cost of producing and administering the new plates."  *Id.* at 3.

**DMV's Implementation of "I Believe" Act.**  Because the "I Believe" plate was created by legislation without a sponsoring organization, the DMV assumed responsibility for the plate design and marketing.  *See* Dkt. No. 119-21 at ¶ 3.b.  Initially, the DMV asked license plate vendor 3M to develop designs consistent with the requirements of the "I Believe" Act.  Dkt. No. 119-22 at ¶ 1.  3M considered a sample license plate from Florida but chose not to use the design based on copyright concerns.  *Id.*

After 3M declined the task, Lotte Devlin ("Devlin"), the DMV's Deputy Director of Vehicle Services, created the design.  *Id.*; Dkt. No. 119-31.  To avoid any copyright violation, Devlin searched for and found a non-copyrighted image of a stained-glass window on the Internet.  She then altered the image, in part, by superimposing a cross on the image of the stained-glass window.  Dkt. No. 119-22 at ¶ 1.  3M created sample plate designs based on Devlin's design.  *Id.*  The DMV's executive staff, including Adams, approved the final design.  *Id.* at ¶ 2.  In compliance with the Governor's directive, the DMV set a premium of $5 above the standard fee to defray the plate's production costs.  Dkt. No. 119-23 at 8 (request no. 38).

**Posting of Image on Website.**  Prior to October 30, 2008, Adams sought legal advice from

12

the DMV's General Counsel regarding whether there were any legal impediments to posting information about the "I Believe" plate on the DMV's website and seeking applications for that plate. Dkt. No. 117-5 ¶ 4 (Affidavit of Frank. L. Valenta, Jr., Esquire ("Valenta Aff.")). General Counsel advised Adams that, in the absence of an injunction, he did not see any reason not to publish the image of the plate on the website. He also advised Adams that the DMV "had no discretion to delay the publication of the image or otherwise halt [its] normal business processes with respect to [the] 'I Believe' license plate." *Id.* ¶ 6.

On October 30, 2008, the DMV posted an image of the design for the "I Believe" plate on its website and began taking orders from the public. Three days later, the DMV announced that it had received the necessary 400 prepaid applications to allow production of the "I Believe" plate. *See* Dkt. No. 119-23 at 9 (request no. 41), 10 (request nos. 44, 45); Dkt. No. 119-9 at 1 (website announcement that "SCDMV has received the required number of pre-applications to manufacture the I Believe license plate.").

**Preliminary Injunction.** As discussed in more detail above, Plaintiffs filed their motion for a preliminary injunction on November 12, 2008. After full briefing, the court heard oral argument and granted Plaintiffs' motion for a preliminary injunction on December 11, 2008. The reasons for the court's rulings are reflected in the Amended Opinion entered December 23, 2008, which slightly modified an earlier Opinion and Order which, in turn, expanded on the reasons given at the conclusion of the hearing. While there were three separate representations of the court's ruling, all were consistent in concluding that Plaintiffs had established both standing and a strong likelihood of success on the merits as to their Establishment Clause claim.

**Subsequent Actions by the DMV and Adams.** Neither Adams nor the DMV have taken any further actions to implement the "I Believe" Act since entry of the injunction. *See* Dkt. No. 117-

13

5 at ¶ 7 (Valenta affidavit stating that he advised Adams to "suspend . . . efforts to produce and issue" the plate when the motion was filed). Consequently, no plates have been ordered from or manufactured by the Department of Corrections over which Ozmint has responsibility.

**"In Reason We Trust" Special Plate.** The only other relevant post-injunction action of the DMV is its publication of the change in availability of the "In Reason We Trust" plate.[13] As the court noted in the Amended Opinion, "[a]s of the date of this order [December 23, 2008], there is one other special plate available that can be construed as tied to a specific "religion"– the Secular Humanists of the Low Country plate which displays an American Flag and the motto 'In Reason We Trust.'" Dkt. No. 59 at 25 n.25. The court further noted that "[t]he connection to the Secular Humanists is not, however, readily apparent on the face of the plate" but only revealed through research on the DMV's website. *Id.* Finally, the court noted that "this special license plate is available only to members of the Secular Humanists of the Low Country." *Id.*

In her memorandum in support of summary judgment, Adams directs the court to a recent change in the availability of the "In Reason We Trust" plate. Dkt. No. 117-1 at 4. As Adams explains, this plate was made available to all South Carolina residents at some point in January 2009–that is, after entry of the Amended Opinion. Thus, this represents a change in the factual circumstances from those present at the time the earlier order was entered.[14] Dkt. No. 117-6 at 2.

_____

[13] The "In Reason We Trust" plate is an organizational plate obtained through the DMV (non-legislative) process. *See, e.g.*, Dkt. No. 119-5 (listing DMV-approved (as opposed to legislatively-approved) "organizational" plates).

[14] In his *amicus* brief, Attorney Gen. McMaster suggests that the court incorrectly characterized the availability of the "In Reason We Trust" plate in the Amended Opinion. *See* Dkt. No. 118 at 4 (stating "contrary to this Court's statement in its December 23, Order (p. 25 n.25), the 'In Reason We Trust Plate' is available to all State residents."). What the Attorney General fails to note, however, is that this change in availability occurred *after* the Amended Opinion was entered. Moreover, the plate continues to be listed on the DMV's website under the "organizations" listing

14

What has not changed, however, is that the "In Reason We Trust" plate was authorized through the DMV approval process, based on a private application by a private organization, and costs an additional $30, at least part of which goes to the sponsoring organization. It was not legislatively-created based on a request from a government official as was the "I Believe" plate, which would be available for an additional five dollar charge, or the more comparable "In God We Trust" plate, which is available at no extra charge.[15] *See* S.C. Code Ann. § 56-3-9200.

## POST-INJUNCTION ACTIONS

**Post-Injunction Appeals to the Public.** After the injunction was issued, two state officials with a connection to this action (Lt. Gov. Bauer and Attorney Gen. McMaster) and an attorney who was then an attorney of record in this action (Kevin Hall, an attorney with NMRS), began making appeals to the public to support the "I Believe" Act and plate. These appeals included speaking in support of the Act at two church-based rallies. In addition, Lt. Gov. Bauer sponsored an on-line petition in support of the Act and sent an e-mail encouraging individuals to sign the petition. The e-mail string, petition, and transcripts of the rallies have been filed in support of Plaintiffs' motion.

---

and under the specific heading "Secular Humanists of the Low Country," not under the heading "In Reason We Trust." Thus, while the plate may now be available to all who prefer to express their trust in reason (for an extra $30 every two years), its heading makes locating the plate challenging. The connection to the sponsoring organization may also discourage purchase by non-members who may not desire to affiliate themselves with (or financially support) the Secular Humanists but might, nonetheless, desire to express their trust in reason, possibly as a counterpoint to the"In God We Trust" plate. In contrast, the "In God We Trust" plate appears under a heading which reflects the wording on the plate, does not suggest affiliation with or support of any specific organization, and is available at no extra charge.

[15] In reviewing legislation, the court determined that the legislature also approved a "God Bless America" plate in 2002. *See* 2002 S.C. Acts 163 (codified as S.C. Code Ann. § 56-3-9500). Attorney Gen. McMaster also notes the existence of or authorization for this plate in his *amicus* brief. Dkt. No. 118 at 4. This plate is not, however, listed among the plates now available on the DMV's website. *See* Dkt. No. 119-3 (printout of all available plates).

3:08-cv-02265-CMC    Date Filed 11/10/09    Entry Number 146    Page 16 of 57

Dkt. Nos. 119-39, 119-40, 119-42, 119-43.[16]

Plaintiffs assert that the court should consider this evidence, most particularly the statements of Lt. Gov. Bauer and Attorney Gen. McMaster, as evidence of the state's motivation and how a reasonable observer would view the Act and resulting plates. Dkt. No. 121 at 8-9. Adams agrees that the court should consider Lt. Gov. Bauer's deposition testimony as to his purpose in seeking passage of the "I Believe" Act but argues the court should disregard all other evidence of motivation (including media reports of legislators). Dkt. No. 117-2 at 14 (discussed *infra* n.40).

**Greer Rally (January 6, 2009).** Lt. Gov. Bauer, Attorney Gen. McMaster, and Attorney Kevin Hall ("Hall") attended and spoke at a rally held at a church in Greer, South Carolina on January 6, 2009 ("Greer Rally").[17] Dkt. Nos. 119-42 (transcript of Greer Rally[18]); 119-33 at 112-13 (Lt. Gov. Bauer conceding accuracy of transcript). The introductory speaker, Pastor Hiett (spelled Hyatt in the transcript) characterized the Greer Rally as "a kick-off rally for . . . support of this license plate, 'I Believe.'" Dkt. No. 119-42 at 4. Pastor Hiett introduced Attorney Gen. McMaster who explained to the audience that "[j]ust about everything like this gets challenged in the Court. *And I'm afraid I got to tell you usually we lose in the courts*, but . . . there will be a day in South Carolina when the words, "I Believe[,]" and the cross will be on a license plate in South Carolina." *Id.* at 14 (emphasis added).

As an example of similar litigation, the Attorney General referred the audience to a recent

_____

[16] During his deposition, Lt. Gov. Bauer conceded the accuracy of the transcripts of the rallies, indicating that he had consulted with counsel before making this concession. Dkt. No. 119-33 at 112-13.

[17] Both Hall and Attorney Gen. McMaster were then counsel of record in this action. *See supra* n.4.

[18] Citations to the transcripts of the Greer and Simpsonville Rallies refer to the number given on the court's docket (CM/ECF header), rather than to the number on the transcript itself.

16

lawsuit filed by a "Wiccan priestess" who challenged inclusion of the words "in Jesus name" in the prayers offered at the commencement of meetings of the Great Falls Town Council.[19]  After expressing surprise that the legal challenge was successful, Attorney Gen. McMaster explained the advice he now gives to other municipalities as follows:

> But we told them, we told every town in South Carolina you go ahead and pray the way you want to, this injunction has been issued against this town on this particular pray[er], but there ha[s] been no ruling on your pray[er].  If you want to . . . pray the way you have been praying, you go right ahead because we believe the First Amendment gives you that right.

*Id.* at 17-18.[20]

---

[19]  The Attorney General was referring to *Wynne v. Town of Great Falls*, C.A. No. 0:01-3409-CMC, in which the undersigned issued a permanent injunction prohibiting defendants from invoking the name of a specific deity in prayers given at town council meetings.  C.A. No. 0:01-3409-CMC, Dkt. No. 57 (Order entered August 21, 2003), *affirmed* 376 F.3d 292 (4th Cir. 2004). The Fourth Circuit Court of Appeals denied rehearing *en banc* by order entered November 1, 2004, *see* C.A. No. 0:01-3409-CMC, Dkt. No. 74, and the Supreme Court denied *certiorari* on June 28, 2005.  *Town of Great Falls v. Wynne*, 545 U.S. 1152 (2005). After the conclusion of appeals, Plaintiff was awarded attorneys' fees and costs of nearly $55,000.  C.A. No. 0:01-3409-CMC, Dkt. No. 87.

[20]  Before sharing this story, the Attorney General referred to a Texas lawsuit challenging inclusion of the phrase "so help me God" in the Presidential Oath of Office. He advised the participants of his view that, even if the suit was successful: "I would be willing to bet that if President-Elect Obama or any other President-Elect use the word, So help me, God, after they take that oath of office, the people will applaud and the people will prevail and *that injunction will not be honored by the President of the United States*."  Dkt. No. 119-42 at 17 (emphasis added).

17

Turning to the Establishment Clause, Attorney Gen. McMaster advised the participants that all that is prohibited by this clause are laws that citizens "ha[ve] to be of a certain religion" and the use of "tax money taken up by the government" to support such mandated religions.  Dkt. No. 119-42 at 18 (also stating "[T]he state cannot tell you this is the only religion you can have and we are going to support those kinds of houses of worship with your tax money. That is the establishment of religion.").  He then explained that "*the courts get [this intent] wrong every time*. . . . [T]he courts ignore this [intent]." *Id.* (emphasis added).  The Attorney General then returned to his discussion of *Town of Great Falls* (discussed *supra* n.19), suggesting that the *courts* were violating the *Free Exercise* Clause by limiting the content of prayers offered by a county council, that is, by requiring that if a prayer is given it be ecumenical, not invoking the name of Jesus.  *Id.* at 19.[21]

The Attorney General introduced Lt. Gov. Bauer who explained how Miles had suggested the idea of the "I Believe" plate, to which the Lieutenant Governor reported he responded:  "That's a great idea. [W]hy don't you get Joe Mack on the phone . . . and see if he can't help us."  *Id.* at 25 (referring to a representative for the Office of Public Policy of the South Carolina Baptist Convention (*id.* at 5)); *see also infra* n.24 (quoting Joe Mack's comments at the Simpsonville Rally). He further explained that he then "went over to the Legislative Counsel and they drafted legislation and lo and behold the Senate did their duty, got it out of the Senate and then it went over to the House."  *Id.* at 25.

---

[21] As these excerpts demonstrate, the Attorney General's comments at the Greer Rally reflect a fundamental misunderstanding of the critical distinctions as well as the interplay between the Establishment Clause, which *limits governmental actions* relating to religion (and, thus, restricts "official" prayer or other acts of endorsement or promotion), and the Free Exercise Clause, which *protects individuals* from governmental interference (and, thus, prohibits interference with private acts of worship).  To his credit, he did concede that the courts fairly consistently disagreed with him as to his interpretation of the First Amendment.  Dkt. No. 119-42 at 13 ("usually we lose in the courts").

Lt. Gov. Bauer then referred the audience to the existence of a "secular tag," though he did not specifically identify it, and stated "if you're atheists, if you're a non-believer, you can purchase a license plate." *Id.* at 25-26.  He stated that he had gone to the DMV to pick one up "to show it on the TV." *Id.* at 26.  He then stated "Never seen one on a car, I'd hate to be in that car." *Id.*

Lt. Gov. Bauer next referred to the diversity of plates available ("104 now") and suggested that "total freedom of speech" was available through this venue to "everybody[] but Christians." *Id.* He then stated: "So we have become a silent majority quite frankly, folks. When a secular group can get a license plate and nobody challenges it, but Christians can't, there's a problem in the system." *Id.*; *see also id.* at 27 ("[I]t is just disheartening to me to hear people [who] want to discourage Christians to be able to speak up, but then they want their freedom of speech.").

Ultimately, he encouraged the participants to let their representatives know their views "[t]hat this issue here means something to you." *Id.* at 28-29.  After assuring the audience that he and the Attorney General were "unified on this" and were "not going to give up," he asked the participants to urge others to talk to their "House and Senate members and thank them for this particular piece of legislation." *Id.* at 29.

Attorney Hall spoke next.  He explained that there was another, non-legislative route through which a similar plate might be obtained: "[I]f we don't prevail purely through the court system, we will take an existing 501C3 corporation, we will change its name to I Believe, will apply for a license plate at the DMV and we will dare them to say no[.]" *Id.* at 37.[22]  Hall closed by exhorting

---

[22]  Hall also referred to the "In Reason We Trust" plate which he described as being "sponsored by the secular humanists of the low country, an atheist group from Charleston."  He stated that he did not agree with this group but, nonetheless, had "no problem" with them having a plate. Like Bauer and McMaster before him, Hall failed to mention that the "In Reason We Trust" plate was not created by statute as was the "I Believe" plate.

the audience to "[s]upport the . . . Christian leaders in this room and make your voice heard, please, please, please, make your voice heard." *Id.* at 38-39.[23]

**E-mail Petition (January 12, 2009).** On January 12, 2009, roughly a week after the Greer Rally, Lt. Gov. Bauer sent an e-mail asking recipients to sign an electronic petition entitled, "I Believe tag in South Carolina." Dkt. Nos. 119-39 (petition), 119-40 (e-mail chain). Although sent from a personal e-mail account, the petition lists "South Carolina Lieutenant Governor Andre Bauer" as the petition's sponsor. Dkt. No. 119-39. The e-mail forwarding the petition includes the following comments regarding the purpose of the petition:

> As you probably know by now, I am a strong advocate for the "I Believe" license plate, and presented the idea to the Legislature after seeing a similar fight in Florida fail. . . . Most recently, the tags were put on hold by a Federal judge, and will most likely be appealed and continue through the court system. I can tell you that this process will not take place in "just days[.]" . . . *It is time that we as Christians let society know that we are tired of backing down in fear of ridicule for exercising our beliefs simply because others say that they are offended.* . . . . Just because I hold public office, I do not stop being a Christian. I will not force my beliefs on any South Carolina citizen but neither will I hide them. If . . . you agree . . . that all South Carolina citizens should have the "choice" to display a license plate on their vehicle that reflects their beliefs at their own cost, then I urge you to join me by signing this online petition . . .. Furthermore, *if you could help by forwarding this link to everyone possible,* and helping to make your friends and family aware of it, it will enable us to get thousands of signatures *and show the world that we Christians do in fact still have a powerful voice.*

Dkt. No. 119-40 (emphasis added).

The attached petition makes no reference to Christianity and, instead, asks whether the signatories "agree that all South Carolina citizens should have the choice to display a license plate on their vehicle that reflects their religious beliefs at their own cost, so long as they meet the

---

[23] The tone of the Greer rally is demonstrated, in part, by a pastor describing Plaintiffs as follows: "One Jewish Rabbi, one Methodist pastor, one first Christian Pastor, and one Unitarian that has not a clue what God is and my friends listen to me, along with him and the ACLU they're going to burn in Hell!" *Id.* at 41-42.

minimal requirements set forth by the DMV." Dkt. No. 119-39. There is no indication of the

purpose for which the petition will be used (*e.g.*, presentation to the legislature, the governor, or

some other purpose).

**Simpsonville Rally (March 17, 2009).** Over two months after the Greer Rally, on March

17, 2009, Attorney Gen. McMaster, Lt. Gov. Bauer, and Attorney Hall attended a second "I Believe"

rally at a church in Simpsonville, South Carolina ("Simpsonville Rally"). Dkt. No. 119-43 at 3-4.[24]

---

[24] Another individual present at both rallies was Joe Mack ("Mack") a representative from
the Office of Public Policy of the South Carolina Baptist Convention. *See* Dkt. No. 119- 43 at 3.
During the Simpsonville Rally, Mack exhorted the audience to encourage other churches to hold "I
Believe" rallies because it would "do a lot to motivate our people and to motivate our elected
officials that this is a good thing, and . . . we need to stand up and defend it." *Id.* at 4-5. Mack
explained that his job was "to represent you over in the General Assembly; represent you from the
standpoint of making sure that our elected officials . . . know what Baptists stand for." *Id.* at 5.
After summarizing several pending issues, he turned to the subject of the rally:

> But tonight we're here to talk about the I Believe legislation that passed last year and
> . . . while he's not quite here yet, I'm going to give him credit, one of the prime
> motivators and the reason we have that [legislation] was Lieutenant Governor Andre
> Bauer. He is the guy that got it started, got it through the General Assembly and into
> law, and we do need to thank Lieutenant Governor Bauer for that. Secondly, I can
> say the Attorney General who's going to be here . . . is defending *us* in this lawsuit
> and he's asked Kevin Hall who will be here tonight talking to you. Kevin is doing
> [this] at no expense *to us*. He's doing as they say pro bono, without any charge; and
> we're thankful for that.

*Id.* at 8 (emphasis added).

Mack also noted his level of influence in the legislature stating as follows:

> [w]hen I go over there and say I represent South Carolina Baptist and our 2000 plus
> churches, they kind of perk up and pay attention because they know that that's a lot
> of votes out there. And so we do have influence and we want to use it in the right
> way. . . . And one of the things we want to see good results on is the I Believe license
> plate; and we're here to hear more about that tonight.

*Id.* at 9.

Pastor Hiett again gave initial comments and introduced the various speakers.

After relaying the story of *Town of Great Falls*, the Attorney General stated his belief that the Supreme Court would, ultimately, construe the First Amendment differently, finding that such restrictions on prayer by public bodies, in fact, "prohibit[ed] the free exercise of religion." Turning to this litigation, he stated as follows:

> I believe by taking the position that we are taking . . . we're not imposing on anyone else's rights to have the free choice to select a license plate that says, I Believe. That does not keep someone else from having one that says, I don't believe[.] [I]t doesn't keep anyone from asking for a different license plate, and, in fact, we have so many. . . . We are going to [have one that says "I Believe."] I'll say to you there will come a day that we will have such a license plate in South Carolina. It infringes on no one's rights.

*Id.* at 15-16.

Lt. Gov. Bauer spoke next, complimenting the size of the crowd which, he stated, "really speaks volumes about this community and what kind of state we have." He continued: "I think it speaks volumes about our legislature that are willing to stand up for what they believe in. . . . Keep in mind this legislation passed . . . unanimously in both houses." *Id.* at 18.

Suggesting, incorrectly, that Plaintiffs were the proponents of the "In Reason We Trust" license plates, Bauer asserted that the country offered religious freedom "*for everyone but Christians. So it's freedom of speech for everybody but believers*." *Id.* at 20 (emphasis added). Bauer encouraged the audience as follows:

> [P]lease speak to the members of the legislature and General McMaster and thank them. They're fighting a real worthy battle. And the legislature, we may have to go back and ask for their help again if we have to attack this from another angle. *We want them to feel secure and that there are people just like you, lots and lots of them that feel the same way that all of you do, and so they need that reassurance.* So when you see your house and senate members, thank them for doing this so that when the other side tries to convince them they shouldn't do anything else from a legislative matter, that no, you believe in this and *this is what our country was*

*founded on and it's time that people of faith don't back down anymore*.

*Id.* at 22 (emphasis added).  After sharing a personal experience, Bauer continued:

> I think God is once again challenging us as individual people and as a country to stand up for the greater country in the world and say, *Judeo Christian individuals started this country, it's what's made this country what every other country wants to be like* and why people still want to come here for the land of hopes and dreams and promises.  And so, *this is our chance to really show the public that Christians are still here to be accounted for.  You know, when they poll anytime in the country it's . . . 80 something percent of the United States citizens consider themselves Christians.  Then why is it so often that we see everybody take a back seat when it comes to Christian issues. . . . We got to stand up.  We've got to make sure not only do we fight this battle, but that we put Christians . . . in every office.*  People are going to stand up for faith and not hide behind it.

*Id.* at 23-24 (emphasis added).[25]

## DISCUSSION

### I.    Standing

The evidence and argument now presented as to Plaintiffs' standing to assert an Establishment Clause claim are essentially the same as presented in connection with the motion for a preliminary injunction.[26]  For the reasons the court earlier predicted Plaintiffs could establish

---

[25]  In his subsequent comments, Pastor Hiett put it a bit more narrowly: "[Fifty] years ago, I wouldn't have to make this statement, much less explain what the statement means.  But here's the statement.  This nation was founded by Christians as a Christian nation."  *Id.* at 32.

[26]  No cases decided since entry of the preliminary injunction in this action suggest any different result.  *See generally Summers v. Earth Island Institute,* ___ U.S. ___, 129 S. Ct. 1142, 1150 (2009) (reaffirming "imminent harm" requirement in finding organizations lacked standing where the only immediate and particularized injury alleged by any of their members had been resolved by settlement leaving no evidence that the challenged government action "threatens imminent and concrete harm to the interests of [the organizations'] members").  A case raising Establishment Clause standing issues is, however, presently pending in the United States Supreme Court.  *See Salazar v. Buono,* 2009 WL 3197881 (transcript of oral argument heard October 7, 2009).  The religious display at issue in that case is, however, a single cross located in a remote area. The standing issues are, therefore, likely to be distinguishable from those in this case which involves state-sponsored religious displays on motor vehicles which Plaintiffs will observe every day, as well

standing, the court now finds that both the individual and organizational Plaintiffs have standing to pursue their Establishment Clause claim. *See* Amended Opinion pp. 9-14, 17. As noted above, this is the only legal theory now pursued, Plaintiffs having abandoned their Free Speech claim after the court expressed doubt as to their standing to assert such a claim.

## II.    Merits

### A.    Claim for Injunctive Relief Pursued Against Defendants in Their Official Capacities.

To the extent relevant to the merits of Plaintiffs' claim for permanent injunctive relief, the parties' legal arguments are largely the same as presented to the court in support of and in opposition to Plaintiffs' motion for a preliminary injunction.[27]    The factual foundation is, however, supplemented as noted above, including by providing evidence relating to: (1) Lt. Gov. Bauer's involvement in introduction of the "I Believe" Act; (2) the DMV actions in designing and posting the "I Believe" plate on its website; (3) the January 2009 change in availability of the "In Reason We Trust" plate; and (4) Lt. Gov. Bauer, Attorney Gen. McMaster, and Attorney Hall's public appeals in support of the "I Believe" plates after the preliminary injunction was entered.

The most significant differences in the parties' legal arguments relate to (1) Ozmint's argument that he should be dismissed as an "unnecessary" party and (2) Adams' argument that she is entitled to qualified immunity as to the claim for damages asserted against her in her individual capacity.    Of these new arguments, only Ozmint's is relevant to Plaintiffs' pursuit of injunctive

---

as displays in the DMV's offices and on its website, both of which Plaintiffs will occasionally visit.

[27] Both sides, of course, exclude discussion of the standard applicable to issuance of a preliminary injunction and, instead, address the claims and defenses in light of the summary judgment standard.

relief.  The court will, therefore, address that argument before turning to the merits of the claim for permanent injunctive relief.[28]

**Ozmint as a Proper Party.**  Ozmint asserts that he should be dismissed from this action because complete injunctive relief is available without enjoining him from production of the "I Believe" plates.  His argument rests on the dual premises that (1) his role is limited to the "ministerial" duty of producing plates ordered by the DMV which, he maintains, is not a sufficient basis on which to apply *Ex parte Young*, 209 U.S. 123 (1908), and (2) an injunction against Adams in her official capacity will afford complete relief.  As to the second premise, Ozmint relies on the factual premise that without an order to fill he would have no reason to produce the plates and on the legal argument that an injunction against Adams in her official capacity is an injunction against the state, equally binding on all state officials.[29]  Ozmint also suggests, incorrectly, that he has not previously argued that the "I Believe" Act is constitutional.  These arguments are addressed, in turn, below.[30]

---

[28]  For discussion of Adams' qualified immunity defense, see *infra* at 44-56.

[29]  In his opening memorandum in support of summary judgment, Ozmint argued that because he is the "state" to the extent sued in his official capacity (as is Adams), "any prospective relief granted by this Court in this case will be binding on Ozmint just as it will be binding on every South Carolina state official and employee."  Dkt. No. 121-1 at 8.  Similarly, in his reply he argued that "Plaintiffs cannot realistically claim that an injunction against Adams will not bar Ozmint or any other official of the State of South Carolina from manufacturing and distributing "I Believe" license plates."  Dkt. No. 135 at 3.

[30]  Ozmint also notes that he "played no role in the adoption of Section 56-3-10530."  Dkt. No. 121-1 at 2.  Neither, however, did Adams.  Involvement in adoption of an unconstitutional law is not, in any event, a prerequisite to pursuit of injunctive relief against its implementation.  *See generally Ex parte Young*, 209 U.S. at 157 (allowing suit against state officials to enjoin enforcement of an act alleged to be unconstitutional").  To the contrary, those responsible for enacting unconstitutional laws are generally shielded by absolute immunity.  *See, e.g.*, *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (holding that "state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities.").  Thus, the court does

**Adequacy of Connection to Enforcement.**   Ozmint asserts that his duties are insufficient for application of the *Ex parte Young* doctrine which requires that he "must have *some connection* with the enforcement of the [challenged] act" to be subject to injunctive relief. *Id.*, 209 U.S. at 157 (emphasis added).  In the context of the "I Believe" Act, "connection with . . . enforcement" is better read as connection with implementation.  *See S.C. Wildlife Fed. v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (holding that the required "'special relation' under *Ex parte Young* has served as a measure of *proximity to* and *responsibility for* the challenged state action.") (emphasis in original); *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (noting that "*Ex parte Young* requires a 'special relation' between the state officer sued and the challenged statute to avoid the Eleventh Amendment's bar.").

As Ozmint notes, neither the "I Believe" Act nor incorporated provisions of S.C. Code § 56-3-8100 impose any obligation on the Department of Corrections over which Ozmint has responsibility.  Ozmint's responsibility for production of the plates is, instead, authorized by a separate statute, S.C. Code Ann. § 24-3-110, and is dependent on receipt of an order from the DMV.[31]

Ozmint is correct that an adequate "connection" or "special relation" to the challenged

_____

not rely on this argument in reaching its decision as to Ozmint.

[31]  Section 24-3-110 reads, in relevant part, as follows:

> The State Department of Corrections may purchase the machinery and establish a plant for the purpose of manufacturing motor vehicle license plates . . . . The charge for license plates . . . sold to the Department of Motor Vehicles . . . shall be in line with the prices previously paid private manufacturers and *all state motor vehicle license plates . . . capable of being manufactured by such a plant shall be purchased through the Department of Corrections and manufactured by it.* The Department of Motor Vehicles may prescribe the specifications of plates . . . the specifications to include colors, quality, and quantity.

S.C. Code Ann. § 24-3-110 (emphasis added).

26

statute does not arise merely because the named official has a general statutory duty to execute the laws of the state.  *See, e.g.*, *1st Westco Corp. v. School Dist.*, 6 F.3d 108, 113 (3d Cir. 1993) (holding that a state attorney general was an improper party because "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."); *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir.1992) ("We doubt that the general supervisory powers of the California Attorney General are sufficient to establish the connection with enforcement required by *Ex parte Young*."); *Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988) (holding that, to establish a sufficient connection between the governor and the challenged action, plaintiff must show that there was "a real, not ephemeral, likelihood or realistic potential that the connection [would] be employed against the plaintiff's interests.") (internal quotations omitted). Indeed, *Ex parte Young* explicitly denounces such an approach, warning that, absent the "special relation" requirement,

> the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the State, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the State in litigation involving the enforcement of its statutes.

209 U.S. at 157.

Actual mention in the challenged statute of the agency over which the named defendant has responsibility is not, however, the only way in which the requisite "special relation" may be established.  Instead, that relationship may be created by other statutes which authorize the defendant's "deep[] involve[ment]" in executing the challenged law.  *Limehouse*, 549 F.3d at 333; *see also Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (holding that defendant officials were properly named when, "although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect to the

[challenged] law"). As explained in *Ex parte Young*, "The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." 209 U.S. at 157.

Ozmint's relationship with the "I Believe" Act arises from his department's statutory right to manufacture license plates for the DMV, and DMV's corresponding obligation to purchase license plates through Ozmint's department (presuming it purchases the equipment to perform this task which it clearly has done). Ozmint's duties relative to implementation of the "I Believe" Act are, therefore, greater and more specific than the generalized duty of state officials such as governors or attorneys general to enforce state law, which the cases referenced above have found inadequate. Even assuming Ozmint's duties with respect to the "I Believe" Act are less significant than the duties described in those cases which have found the connection adequate, they remain critical to implementation of the "I Believe" Act given that Ozmint is the director of the only agency which may actually manufacture the challenged plates. On balance, the court finds that the duty of manufacture imposed by S.C. Code Ann. § 24-3-110 creates a sufficient relationship with the "I Believe" Act to support naming Ozmint as a Defendant in this action.[32]

**Necessity for Final Relief.** The court, therefore, turns to whether it is, nonetheless, appropriate to dismiss Ozmint from this action at this point in the proceeding. As to this question, the court considers first that Ozmint has, contrary to his present argument, taken a position that the

---

[32] Although not determinative, given that the issue was apparently not raised in that case, it is of some note that the Director of the Department of Corrections was among the defendants enjoined in *Planned Parenthood of S.C., Inc., v. Rose*, 236 F. Supp. 2d 564 (D.S.C.) (permanently enjoining all defendants from "all activities related to the enforcement of" statute which created the "Choose Life" license plate), *affirmed,* 361 F.3d 786, 794 (4th Cir. 2004), *reh'g denied*, 373 F.3d 580 (4th Cir. 2004).

"I Believe" Act is constitutional. That position was presented through his opposition to the motion for a preliminary injunction which he filed jointly with Adams. *See supra* n.6. Thus, Ozmint has advanced the position that the statute is constitutional and has done so in the forum where it matters most: in court.

At no point prior to his motion for summary judgment did Ozmint make more than a passing reference to what is now his sole argument: that he is not a proper (or at least not a necessary) defendant because his duties are merely ministerial and dependent on an order from Adams. That passing reference was included in his memorandum in opposition to injunctive relief. He did not at that time or at any point prior to moving for summary judgment offer his present assurances that he would consider any injunction issued against Adams (presumably including a prohibition against *ordering* any "I Believe" plates) sufficient to preclude him from *manufacturing* the plates.[33] *See supra* n.29. Neither did he appeal his inclusion in the preliminary injunction order or take action to gain dismissal from this action at any point prior to the deadline for filing dispositive motions.

In other words, Ozmint has been a party to this action since June 19, 2008, has joined in arguing that the "I Believe" Act is constitutional, has been enjoined from production of the "I Believe" plates since December 11, 2008, and has participated in all pretrial proceedings throughout the pendency of this matter. Despite these facts, and the existence of case law suggesting he is a proper party (*supra* n.32 addressing *Rose*), Ozmint failed to make more than a peripheral mention of his present position that he is not properly named or at least an unnecessary party until he filed his motion for summary judgment after the conclusion of discovery. Likewise, he failed to offer his present concession (that he would view an injunction against Adams as binding on him despite

---

[33] Although the court may enjoin Adams from ordering license plates, it may not enjoin her from their manufacture as that duty is not within her powers. Instead, it is a duty imposed solely on Ozmint. *See* S.C. Code Ann. § 24-3-110.

differences in their statutory duties relative to the Act) until the summary judgment stage.  Under these circumstances, the court finds that Ozmint remains a proper Defendant.[34]

**Establishment Clause**.  Except as modified or supplemented below, the court incorporates and reaffirms its earlier discussion of the merits of Plaintiffs' Establishment Clause claim as set forth in the Amended Opinion at 22-28.  In doing so, the court converts its earlier prediction that Plaintiffs would succeed on the merits of this claim into a finding that Plaintiffs have, as a matter of law, established that the "I Believe" Act violates the Establishment Clause and that they are entitled to a permanent injunction against implementation of the Act.

The court writes further here primarily to address additional evidence presented in support of or opposition to summary judgment which was not considered in the Amended Opinion.  That evidence does not, however, modify the analysis as previously presented or suggest any error in the prediction that Plaintiffs would succeed on the merits of their Establishment Clause Claim. As discussed below, however, the new evidence provides additional support for the same conclusion previously reached.

The Establishment Clause of the First Amendment provides that: "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  This prohibition is extended to the states by virtue of the Fourteenth Amendment.  *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947);  *see also Brown v. Gilmore*, 258 F.3d 265, 273 (4th Cir. 2001).

The Establishment Clause, thus, prohibits both the federal and state governments from

---

[34]  It is of some note here that the Attorney General has an admitted history of advising public officials that they may ignore injunctions which are not directed specifically to them, even when to do so ignores clearly established law, at least where the Attorney General's views conflict with judicial interpretations of the First Amendment.  *See supra* at 17 (comments at Greer Rally referring to *Town of Great Falls*).  He has also proclaimed his intent to persist with efforts to produce the "I Believe" plates, regardless of the outcome of this action.  *See supra* at 22 (comments at Simpsonville Rally).

establishing a religion in the sense of "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 668 (1970). As more recently explained by the Supreme Court, "government may not *promote or affiliate itself with* any religious doctrine or organization." *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989) (emphasis added). The Establishment Clause is not, as some might suggest, an anti-religion provision, but rests on the understanding that "a union of government and religion tends to destroy government and to degrade religion." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

Courts apply the three-part test set out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) to determine whether a challenged state action is constitutional. *See, e.g.*, *Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005); *Koenick v. Felton*, 190 F.3d 259, 264-65 (4th Cir. 1999). To pass the *Lemon* test, the challenged governmental action must (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster an excessive government entanglement with religion. *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003). All three prongs of the test must be met for the challenged action to be constitutional. *Lambeth*, 407 F.3d at 265 ("If a state action violates even one of these three prongs, that state action is unconstitutional."). As summarized below and set forth in more detail in the Amended Opinion, the "I Believe" Act fails every prong of this test as a matter of law.

**Purpose.** To ascertain whether a statute has a secular purpose, courts applying the *Lemon* test look to "the traditional external signs that show up in the test, legislative history, and implementation of the statute, or comparable official act." *McCreary Cty. v. ACLU*, 545 U.S. 844, 862 (2005) (internal quotations omitted). The court looks first to the text of the legislation to

31

determine its purpose.[35]

That text *authorizes* the DMV to produce only one specific license plate, and *requires* that the authorized plate contain uniquely Christian imagery (a cross superimposed on a stained glass window) under the motto "I Believe." Thus, the Act demonstrates an obvious and singular purpose of legislative endorsement and promotion not only of religion in general, but of Christianity in particular. This intended purpose is so clear that the court would find it controlling *even if* there were evidence of some other stated legislative purpose. *See Mellen*, 327 F.3d at 373 ("When a state-sponsored activity has an overtly religious character, courts have consistently rejected efforts to assert a secular purpose for that activity."); *N.C. Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145, 1149-50 (4th Cir. 1991) (finding purpose of prayer at opening of judicial proceedings was inherently religious despite judge's assertion that the purpose was to solemnify and dignify the proceedings); *Hall v. Bradshaw*, 630 F.2d 1018, 1020-21 (4th Cir. 1980) (finding purpose of inclusion of prayer on state-issued road maps was inherently religious despite state's claim that the purpose was to advance the safety of motorists).

Here, however, there is no evidence of any other purpose. Instead, as discussed below, the limited extrinsic evidence of legislative purpose suggests either a desire to promote Christianity or, at the least, to acknowledge and honor Christianity as the "majority" religion. The second purpose is just as improper as the first. *See Allegheny*, 492 U.S. at 593 (noting that the Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred.*") (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring in judgment)) (emphasis in original).

---

[35] Courts applying the *Lemon* test typically analyze a statute's legislative history to help understand its purpose. *See, e.g.*, *Wallace v. Jaffree*, 472 U.S. 38, 58 (1985). That option is not, however, available in this case because the "I Believe" Act has no official legislative history.

**Secular Purpose Advanced by Adams**.  In her memorandum in support of summary judgment, Adams asserts that the "I Believe" Act serves the secular purpose of "provid[ing] South Carolina motorists with another message that they can elect to convey when selecting from over one hundred available special license plates."  Dkt. No. 117-1 at 14 (quoting Amended Opinion's statement of Defendant's position).  She notes, in particular, that the "I Believe" plate "offers . . . an alternative to the 'In Reason We Trust' plate, which to date is arguably the only other plate tied to a specific religion."  *Id.*[36]

In her memorandum in opposition to Plaintiffs' motion for summary judgment, Adams takes this claimed purpose a step further, describing it as a "stated purpose."  Dkt. No. 130 at 4.  As noted above, however, the legislature has offered no "stated purpose" for the Act.  The only "stated purposes" are the post-hoc justifications offered during the pendency of this litigation, including those formally offered to the court and those expressed publicly by the Lieutenant Governor and the Attorney General.

**Attorney General's Statement of Purpose.**  Attorney Gen. McMaster takes a different tack in his *amicus* brief, stating that "[r]ather than being motivated by a secular purpose, the ['I Believe' Act] is instead an *accommodation to Christians*, just as the other plates are accommodations to Parrot Heads and fraternity and sorority members."  Dkt. No. 118 at 8 (emphasis added).  This argument ignores the facts that (1) the Act was not the result of any application or request from a Christian organization but was, instead, the result of *de facto* sponsorship by the Lieutenant

---

[36] There is no evidence that the legislature even considered the availability of the DMV-approved "In Reason We Trust" plate, much less was motivated by its existence, when it enacted the "I Believe" Act.

33

Governor[37] and official sponsorship by three legislators; and (2) the "I Believe" plate was approved

through the legislative process, not through the DMV approval process which is now (and was at

the relevant time) the generally available route for organizations seeking special plates.[38]

Though stated differently, the arguments of both Adams and the Attorney General stand,

essentially, for the same proposition: that the purpose behind the Act is not endorsement of religion

because it merely affords Christians an opportunity to display their faith on a license plate. This

claimed purpose is, however, belied by the overtly and singularly religious nature of the

legislatively-selected message and imagery. It is also contradicted by the plain text of the "I

Believe" Act which says nothing of making a choice available to all religious groups but, instead,

authorizes production of a single plate which "must" contain a specified pro-Christian message. It

is also belied by the absence of any other license plate, legislatively-approved or otherwise, which

is so clearly connected to a specific religion. *See supra* at 14-15 (discussing the "In Reason We

Trust" plate).

*Any* religious message approved through South Carolina's legislative process (such as was

used to create the "I Believe" plate) would likely violate the Establishment Clause because the

speech involved is predominantly government speech and the legislative approval of it evidences

---

[37] Although the Lieutenant Governor, rather than a religious organization, initiated the process, the Lieutenant Governor advised those gathered at the Greer Rally that his first thought *after* deciding to seek approval of such a plate was to contact Joe Mack of the South Carolina Baptist Convention. Dkt. No. 119-42 at 25. This not only demonstrates that the idea originated with a governmental official, but confirms that the official involved viewed the legislation as of benefit to one religious group in particular.

[38] Differences between the two procedures, including limitations on what may be included on a plate obtained through the DMV process, are discussed in the Amended Opinion at 4-10. Changes which have been made to the DMV process over the years are discussed in the addendum to the Amended Opinion.

approval of the referenced religion.[39]     The Legislature's decision to select a single (majority)

religion for such treatment exacerbates the constitutional concerns because it gives the impression

that Christianity, as the majority religion, is also the preferred religion and its adherents favored

citizens.  *See Allegheny*, 492 U.S. at 602 (quoted *supra* at 2).  Thus, even without considering any

other evidence, the court would find the "I Believe" Act violative of the first prong of the *Lemon*

test based on the "overtly religious character" of the license plate it authorizes.  *See Mellen*, 327 F.3d

at 373; *see generally Hall*, 630 F.2d at 1020-21 (noting that if state could satisfy the purpose inquiry

by choosing "a clearly religious means to promote [a] secular end," then "any religious activity of

whatever nature could be justified by public officials on the basis that it has beneficial secular

purposes.") (internal quotation marks omitted).

     **Extrinsic Evidence of Purpose.**  For reasons addressed above, it is not necessary to consider

extrinsic evidence in determining legislative purpose.  Nonetheless, because both sides urge

consideration of at least some extrinsic evidence, the court reviews that evidence here.[40]

---

[39] As explained in greater detail in the Amended Opinion, a special license plate can be created either by the General Assembly or by the DMV upon application of a private organization. *See* Amended Opinion at 6-9.  Although both processes lead to a common result (the creation of a special license plate), they are inherently different as one is a legislative process (with a greater element of governmental speech and, therefore, greater Establishment Clause concerns) and one is an administrative process (with a greater private speech element and, therefore, greater Free Speech Clause concerns).  As Judge Michael noted in *Planned Parenthood of S.C., Inc., v. Rose*, a legislatively-approved license plate (there the "Choose Life" plate) constitutes hybrid speech, involving aspects of both governmental and private speech.  *Rose*, 361 F.3d 786, 794 (4th Cir. 2004), *reh'g denied*, 373 F.3d 580 (4th Cir. 2004) (denying rehearing *en banc* by an eight to five vote).  In reaching this conclusion, Judge Michael distinguished legislatively-approved plates from plates which are "sought and designed by [a] private sponsor."  361 F.3d at 793 (Michael, J.).  Adams and the Attorney General ignore this distinction in suggesting that the "In Reason We Trust" organizational plate is comparable to and provides justification for the legislatively-created "I Believe" plate.

[40] In addressing the extrinsic evidence of purpose, Adams argues that the court should not consider comments that legislators have made to the media, because such evidence is inadmissible under South Carolina law. Dkt. No. 117-1 at 14 (citing *Kennedy v. S.C. Retirement Sys.*, 549 S.E.2d

Lt. Gov. Bauer's deposition testimony regarding the genesis of the Act demonstrates that his intent as *de facto* sponsor was specifically to gain approval of a Christian-themed plate. He may have considered the diversity of plates in existence in deciding that it was appropriate to seek such a plate. *See* Dkt. No. 119-33 (Bauer Dep. at 10:19-11:6) (noting he sponsored the bill in light of the diversity of other plates available and stating "I thought that if everyone else is allowed that opportunity, why shouldn't believers in the Christian faith be able to express themselves – as so many other people have been able to."). He did not, however, suggest that he proposed legislation to make it easier for all groups to get a plate proclaiming their beliefs (for example, an "I Believe" plate with a blank for the vehicle owner's symbol of choice). Instead, the legislation he sought was the legislation he received: legislation authorizing a single plate containing uniquely Christian imagery selected by the Legislature. His concession that he decided to seek an "I Believe" plate for South Carolina after learning of a failed attempt to obtain a similar plate in Florida also suggests a singular purpose: obtaining a Christian-themed plate, not opening the door for all groups to have similar plates. Thus, considering only the extrinsic evidence Adams asks the court to consider, the court would reach the same conclusion as set forth above: the "I Believe" Act impermissibly endorses and promotes Christianity.

Consideration of any of the other available extrinsic evidence leads to the same result. For example, comments by sponsoring and other legislators as reported in the media suggest that these

---

243, 250 (S.C. 2001)). In contrast, she asserts that the court should consider the Lieutenant Governor's testimony regarding legislative intent because he "is a member of the executive branch" and the executive branch's interpretation of the law may be relevant. *Id.* at 15 (citing *Kennedy*, 549 S.E.2d at 251). Plaintiffs, on the other hand, argue that the court may consider both categories of evidence because federal courts "routinely consider government officials' statements when legislative purpose is unclear or ambiguous." Dkt. No. 127 at 8 (citing, *e.g.*, *Wallace v. Jaffree*, 472 U.S. 38, 56-60 (1985) (weighing sponsor's evidentiary hearing testimony in concluding that Alabama's moment-of-silence bill lacked a secular purpose)).

legislators were motivated by a desire to support one specific religion, Christianity.[41]  To the extent

these legislators indicated any willingness to consider plates for other religions, they noted that they

would make value judgments as to which religions were worthy of a plate and would certainly not

approve plates for all "religions."[42]  Lt. Gov. Bauer and Attorney Gen. McMaster's comments at the

Greer and Simpsonville rallies, likewise, suggest that a desire to promote (or at least appeal to the

members of) the majority religion motivated Lt. Gov. Bauer to seek passage and both individuals

to continue support of the Act.

        The following comments made by Lt. Gov. Bauer at the Greer rally are particularly

indicative of this intent:

> So we have become a silent majority quite frankly, folks. When a secular group
> can get a license plate and nobody challenges it, but Christians can't, there's a
> problem in the system. . . . And that's why we're all here tonight unified. Quite
> frankly, we're under attack and we've got to continue to fight this battle.

Dkt. No. 119-42 at 25:16-21.  As with a number of the comments at the two rallies, this comment

incorrectly suggests that the "I Believe" plate was obtained by a process similar to that used to

obtain the "In Reason We Trust" plate.  To the contrary, the "I Believe" plate was obtained through

specific legislation, had no sponsoring organization, and, to the extent it was sponsored by a non-

legislator, had a governmental sponsor:  the Lieutenant Governor.  In contrast, the "In Reason We

---

[41]  While media reports are of limited if any evidentiary value, the court notes that no party
has submitted any evidence that the reported statements are inaccurate.

[42]  According to newspaper reports, Representative Sandifer was questioned as to whether
he would support a license plate for another religion like Islam to which he responded, "Absolutely
and positively no."  Dkt. No. 119-12 at 3.  He explained that this was "because of my personal belief
and . . . wouldn't be the wish of the majority of the constituency in this house."  *Id.*  Senator McGill
was reported as stating he would not support a plate for Wiccans because Wicca was "not what [he]
consider[s] to be a religion."  When asked about a plate for Buddhists, he responded that he would
"have to look at the individual situation."  Dkt. No. 119-10.  Senator Bryant wrote in his Internet
blog that "I guess I'd have to admit I could support a plate for the Jewish community, yet would be
very uncomfortable with a plate for scientology."  Dkt. No. 119-11.

Trust" plate was obtained through the DMV process and was sponsored by (and until recently only available to members of) a private organization.[43]

During the Greer Rally, Lt. Gov. Bauer characterized the issues in this case as a dispute between "athiests" or "non-believers," who were able to obtain a special plate, and "Christians," who could not.  Dkt. No 119-42 at 25-26.  In his e-mail supporting his on-line petition, the Lieutenant Governor sounded the same theme.  Dkt. No. 119-40 at 1 ("It is time that we as Christians let society know that we are tired of backing down in fear of ridicule for exercising our beliefs simply because others say that they are offended. . . . . if you could help by forwarding this link to everyone possible, and helping to make your friends and family aware of it, it will enable us to get thousands of signatures and show the world that we Christians do in fact still have a powerful voice.").

At the Simpsonville Rally, Lt. Gov. Bauer expanded on this theme of appealing to a Christian majority with political might:

> And so, this is our chance to really show the public that Christians are still here to be accounted for.  You know, when they poll anytime in the country it's . . . 80 something percent of the United States citizens consider themselves Christians.

---

[43] The two plates are distinguishable in various other respects.  For example, while the "I Believe" plate includes inherently Christian imagery, the only symbol on the "In Reason We Trust" plate is the American flag.  Further, unlike the "I Believe" plate, nothing on the "In Reason We Trust" plate expressly or implicitly links it to Secular Humanism.

Considering the express language on the "In Reason We Trust" plate and its choice of symbol, it seems, at most, a counterpoint to the "In God We Trust" plate which is available to all South Carolinians without extra charge.  To this court's knowledge, no challenge has been made to the constitutionality of the "In God We Trust" plate. *See generally Lynch v. Donnelly*, 465 U.S. 668, 716 (1984) (Brennan, J., dissenting) (suggesting phrases such as "In God We Trust" are best explained as "ceremonial deism," or practices "protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content"); *Lambeth*, 407 F.3d at 270 (finding no constitutional violation in inscription of "In God We Trust" on the side of a government building and noting that the Fourth Circuit had "heretofore characterized the phrase, 'In God We Trust,' when used as the national motto on coins and currency, as a 'patriotic and ceremonial motto' with 'no theological or ritualistic impact.'" ).

> Then why is it so often that we see everybody take a back seat when it comes to
> Christian issues. . . . We got to stand up. We've got to make sure not only do we
> fight this battle, but that we put Christians . . . in every office.

Dkt. No. 119-43 at 24; *see also id.* at 20 (characterizing the state of the law–or at least the law in this case–as "freedom of speech for everybody but believers"); *id.* at 22 (encouraging attendees to contact their legislators in support of the Act because "[w]e want them to feel secure and that there are people just like you, lots and lots of them that feel the same way that all of you do, and so they need that reassurance."). This resounding and repeated theme expressed by a state official who was the *de facto* sponsor of the "I Believe" Act suggests that one purpose of the Act was to foment "political division along religious lines." As the Court has explained: "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, *but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect*." *See Lemon*, 403 U.S. at 622 (emphasis added).[44]

It is notable that these rallies were held in churches, led by a pastor, attended by a lobbyist for the Baptist Association, and included only speakers representing a (specific) Christian perspective. *See* Dkt. No. 119-43 at 19 (Lt. Gov. Bauer's reference during the Simpsonville Rally to the Greer Rally as "the last church service"). It is also notable that the church-affiliated speakers spoke of the Lieutenant Governor, the Attorney General, and Hall, who then represented Adams in this litigation, as "representing us" in supporting the legislation, including through representation

---

[44] The court does not suggest that it is inappropriate (or particularly unusual) for a politician to appeal to constituents who are members of a particular religious group when seeking support in an election or for a particular legislative agenda. What is inappropriate is to use legislative or other governmental powers to endorse a particular religion or to suggest that members of that religion are in special favor and in a particular position to influence governmental action. To the extent comments such as those referenced in the text shed light on the purpose behind the legislation, they suggest just such an intent.

in the litigation. *See supra* n.24 (comments of Joe Mack). While these comments do not reflect directly on *legislative* intent, they are, at least, sufficient to cast doubt on any inference that Lt. Gov. Bauer's purpose in proposing the Act was a generic interest in supporting diversity of opinion for all faiths.

For the reasons set forth above, the court finds that the overtly Christian design of the "I Believe" plate, which is the sole subject of the legislation, is, alone, sufficient to establish that the challenged Act was "'motivated by a purpose to advance religion,'" specifically Christianity. *Lambeth*, 407 F.3d at 270 (quoting *Mellen*, 327 F.3d at 372). The plain language of the Act precludes any suggestion that the true purpose was to promote a greater diversity of license plates, particularly as to the vehicle owner's religious or non-religious views. The arguments of Adams and the Attorney General that the goal was to promote diversity (or "accommodate" the desires of Christians for such a plate) not only lack any evidentiary support, but are contrary to available evidence regarding the genesis of the Act. The court, therefore, finds that the "I Believe" Act fails the first prong of the *Lemon* test as a matter of law, whether or not the court considers extrinsic evidence of purpose as set forth in Lt. Gov. Bauer's deposition, media reports of legislators' comments, or events post-dating passage of the Act and issuance of the preliminary injunction.

**Effect.** The second prong of the *Lemon* test requires that the primary effect of the government action neither advance nor inhibit religion. This prong is often referred to as the endorsement test.

The "I Believe" Act's primary effect is to promote a specific religion, Christianity. This is true not only because the "I Believe" plate has the effect of any other form of "advertising," but, more ominously, because legislative authorization of this plate (and no other religious plate) signals

40

that the referenced religion is uniquely worthy of legislative endorsement and promotion.  Such endorsement and promotion is clearly prohibited by the Establishment Clause.  *See Allegheny*, 492 U.S. at 593 (noting that the Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred*") (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring)).

The extrinsic evidence relating to the genesis of the Act and post-injunction promotion of the Act further support the conclusion that the "effect" of the Act is endorsement and promotion of religion.  As discussed above, Lt. Gov. Bauer initiated the "I Believe" Act legislation and found sponsoring senators to introduce the legislation in the General Assembly.  When the state voluntarily creates a Christian plate and no other religious or non-religious philosophy plate, the state has violated the Establishment Clause because the effect is that religion, and in this case the particular religion of Christianity, is endorsed, promoted, and advanced by the state.

The post-injunction actions of the Lieutenant Governor and Attorney General, including comments at church-sponsored rallies, further demonstrate this impermissible effect.  Indeed, the tone set in these rallies ("believers" under siege by "non-believers" or "atheists") and the repeated appeals to the participants to raise their collective (Christian) voices and show their political might (as members of a strong majority religion) demonstrate the particular concerns of the "endorsement" effect of the Act.  These actions run afoul of "the essential command of the Establishment Clause" which is "that government not make a person's religious beliefs relevant to his or her standing in the political community by conveying a message 'that religion or a particular religious belief is *favored* or *preferred*.'"  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 33 (2004) (O'Connor, J., concurring).     Even without knowledge of the history of the "I Believe" Act or the

41

alternative processes for establishing special plates, a reasonable, objective observer would likely consider that a state-issued license plate bearing Christian images carries the endorsement of the state.[45] This is particularly true given the absence of any similar plate for any other religion.[46] Just as a reasonable, objective observer would likely conclude that the state of South Carolina was promoting tourism with the website address "Travel2SC.com" on its standard-issue plate, that same observer would reasonably believe that the state is promoting Christianity through its "I Believe" plates which are legislatively-created and DMV-designed and marketed. *See generally Lambeth*, 407 F.3d at 271 (noting that proper question under second prong of *Lemon* test is "whether a particular display, with religious content [here the inscription "In God We Trust"], would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion.").

Under these circumstances, the court finds as a matter of law that the "I Believe" Act, and the plate it authorized, have the effect of state endorsement of Christianity. The court would reach this same conclusion without consideration of evidence of post-injunction promotion of the Act and license plate.

---

[45] The DMV acknowledges this likelihood in its published policy concerning special plates for organizations (Policy RG-504): "Designs displayed on state license plates are approved by the State for display to all audiences on the public highways and are the sole responsibility of the State." DMV Policy RG-504.

[46] As noted above, the most comparable other license plates are the "In God We Trust" plate (a legislatively-created plate available without restriction and at no extra charge) and the "In Reason We Trust" plate (a DMV-approved organizational plate recently made available without restriction for an extra charge of $30 every two years). The messages on these two plates are comparable though in counterpoint to each other, one arguably pro-religious and the other arguably counter-religious. Neither plate refers to or, through its imagery, suggests any specific religion or philosophy.

**Entanglement.** The final prong of the *Lemon* test requires that government action not foster an excessive government entanglement with religion. As explained in *Agostini v. Felton*, when evaluating entanglement with religion, courts must consider "'the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" 521 U.S. 203, 232 (1997) (quoting *Lemon*, 403 U.S. at 615).

As *Agostini* suggests, entanglement is harder to describe and evaluate than the other prongs. It is, however, apparent that the "I Believe" Act, and the course on which it will force the legislature to embark, will foster entanglement between the state and one or more religions.

First, the state entangled itself in religion by its very decision to use Christian symbols and references on a legislatively-authorized license plate. In doing so, the state entered the debate between those Christians who favor actions and displays which proclaim their religion in a very public way and those Christians who do not. Perhaps more critically, the state has entered the debate between Christians who believe that entanglement between government and religion "tends to destroy government and to degrade religion[,]" *Engel*, 370 U.S. at 431, and those who believe that passage of legislation such as the "I Believe" Act is appropriate because the majority of voters identify themselves as Christians. *See* Dkt. No. 119-43 at 22-24 (Lt. Gov. Bauer comments at Simpsonville Rally).

The even greater risk of excessive entanglement that will follow adoption of the "I Believe" Act is that the Legislature must decide which religions and non-religious philosophies are worthy of other legislatively-authorized license plates. Fortunately, the Establishment Clause prohibits the state from engaging in such determinations. *See Larson v. Valente*, 456 U.S. 228, 246 (1982)

43

(applying strict scrutiny to strike down a statute permitting governmental discrimination between religions). Because governmental preference for one religion over others triggers strict scrutiny, even facially neutral laws may be invalidated.[47]

For the reasons set forth above, the court finds as a matter of law that the "I Believe" Act fails the entanglement prong of the *Lemon* test. The court would reach the same conclusion without consideration of post-injunction actions and comments. To the extent those actions are considered, however, they demonstrate the risks of entanglement when the state endeavors to sponsor, approve, and subsequently defend placement of overtly religious symbols on government-issued and owned license plates.

**Conclusion.** For the reasons set forth above, the court concludes that Plaintiffs have established as a matter of law that the "I Believe" Act fails to satisfy even one of the three prongs of the *Lemon* test. The court, therefore, concludes that the Act violates the Establishment Clause. The court further finds that permanent injunctive relief is proper and should be entered against both Defendants in their official capacities.

## B.    Claim for Nominal Damages Pursued against Adams in her Individual Capacity.

Plaintiffs seek nominal damages from Adams in the amount of $1 for injuries they suffered as a result of Adams' actions in implementing the "I Believe" Act. Because the "I Believe" plate was never issued, Plaintiffs' injuries are limited to those suffered when Plaintiffs viewed an image of the proposed plate on the DMV's website and through the media. The specific actions Adams

---

[47] Even assuming the Legislature would not violate the Establishment Clause by approving license plates for all such groups, religious discrimination concerns would remain absent waiver of the statutorily- required 400 prepaid applications for special plates. This is because minority religions may be unable to obtain the necessary 400 applications.

had taken at that point included (1) allowing or directing a DMV employee to design the plate (a predicate to posting the image), (2) directing DMV employees to post an image of the proposed plate on the DMV's website and to disclose the image to the media,[48] and (3) directing DMV employees to accept orders for the plate. The last of these actions is not alleged to have contributed to Plaintiffs' injuries.

Adams argues that qualified immunity shields her from liability for money damages because she did not violate Plaintiffs' clearly established constitutional rights of which a reasonable person would have known. Dkt. No. 117-1 at 7. She notes, *inter alia*, that there were no prior decisions from this district, the Fourth Circuit, or the United States Supreme Court addressing whether, or under what circumstances, religious-themed license plates violate the Establishment Clause. She also argues that the legal authority which was available amounts to "a jumbled constitutional jurisprudence" from which she could not reasonably predict that the "I Believe" Act would be held unconstitutional (a point she does not, in any event, concede). *Id.* at 7.

Turning to the available "license plate" jurisprudence, Adams suggests that the "I Believe" plate is similar to the organizational plate at issue in *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commission of Virginia Dept. of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002), *reh'g en banc denied,* 305 F.3d 241 (4th Cir. 2002) ("*SCV*"), which a majority of the panel concluded constituted "private" speech.[49] Relying on this determination, Adams argues that the message on

---

[48] The image was posted on October 30, 2008, over four months after this litigation was commenced (June 19, 2008) and before the motion for preliminary injunctive relief was filed (November 12, 2008).

[49] Under the Virginia program at issue in *SCV*, special license plates could "be issued to members and supporters of various organizations or groups" but the plates had to be "specifically authorized by statute." 288 F.3d at 614. Normally, the sponsoring organization was allowed to

the "I Believe" plate is not government speech at all, or at least that she reasonably believed it was not, thus supporting her qualified immunity claim. Adams seeks to distinguish the legislatively-created "Choose Life" plates at issue in *Rose*, where three judges agreed the South Carolina license plates at issue included at least some elements of government speech. *Planned Parenthood of S.C., Inc., v. Rose*, 361 F.3d 786 (4th Cir. 2004), *reh'g denied*, 373 F.3d 580 (4th Cir. 2004) (discussed *supra* n.39). Finally, Adams notes that the case law applying the Establishment Clause has been described by at least one member of the Supreme Court as "in hopeless disarray." Dkt. No. 117-1 at 8 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 861 (1995) (Thomas, J., concurring).

The court addresses these points in reverse order acknowledging, as a preliminary matter, that Establishment Clause jurisprudence remains in a degree of flux with many of the Supreme Court's recent decisions being particularly difficult to interpret and apply due, in part, to the number and diversity of concurring and dissenting opinions. This is not, however, to say that there are no clearly established principles under the Establishment Clause or that those principles do not govern the constitutionality of the "I Believe" Act. In the undersigned's view, a reasonable person with a

---

include its logo on the plate. The legislation authorizing a Sons of Confederate Veterans plate, however, prohibited inclusion of the group's logo because that logo included a depiction of the Confederate flag. The district court and majority of the panel agreed that the particular plate program at issue constituted private speech and, consequently, that the denial of the right to include the logo due to its content constituted viewpoint discrimination thereby violating the Free Speech Clause. By a six-to-five margin, the full court denied a request for rehearing *en banc*. *Id.*, 305 F.3d 241. As Judge Wilkinson noted in explaining his vote to deny rehearing *en banc*, the legislation authorizing the SCV plate was the *only* such legislation (out of over 100 such statutes) in which the legislature had denied the right to include a logo. *Id.*, 305 F.3d at 242 (Wilkinson, J., concurring). The critical point on which the judges disagreed, however, related to whether the plate scheme at issue constituted purely private, purely government, or hybrid speech. *Id.*, 305 F.3d at 244-45 (Luttig, J., concurring).

basic understanding of Establishment Clause jurisprudence would easily have predicted that this proceeding would conclude with a determination that the Act was unconstitutional.[50]

In reaching this conclusion, a reasonable person would have found the Fourth Circuit's most recent license plate decision, *Rose*, to be determinative of the threshold question whether a legislatively-sponsored and approved plate was, at least in part, government speech.[51]  Despite the absence of an actual "majority" opinion in *Rose*, all three judges on the panel agreed that legislatively-sponsored and approved plates involve at least some element of government speech. *See Rose*, 361 F.3d at 794 (stating that "[B]oth the State and the individual vehicle owner are speaking" at least when the vehicle owner selects a legislatively-created plate) (Michael, J.); *id.* at 800 (reasoning that all vanity plates constitute hybrid speech) (Luttig, J., concurring); *id.* at 801 ("'license plate programs . . . have elements of both private *and* government speech.'") (Gregory, J., concurring) (quoting *SCV*, 305 F.3d at 252 (Gregory, J., dissenting))..

Indeed, Judge Michael focused on the distinctions between license plates created based on the application of a private organization (such as the plate at issue in *SCV* and South Carolina's "In Reason We Trust" plate) and those created solely though legislation (such as the "Choose Life" plate at issue in *Rose* and the "I Believe" plate at issue here) in concluding that the latter had greater

---

[50]  Adams suggests that she relied, in part, on the fact that the Attorney General was "affirmatively defending the [c]onstitutionality of the 'I Believe' legislation" at the time she posted the image of the proposed license plate on the DMV's website. Dkt. No. 117-1 at 8.  She does not, however, suggest or proffer evidence that the Attorney General provided her with an opinion as to the likely outcome of the litigation.  By contrast, the Attorney General's public comments at the two church rallies suggest that he was well aware of the probable, if not inevitable, outcome, though he disagreed with the law.

[51]  In contrast to the arguments advanced in this action, the defendants in *Rose* argued that South Carolina's legislatively-created plates constituted *purely* government speech.

47

indicia of government speech.  As he explained:

> The *SCV* plate was sought and designed by the plate's private sponsor, the
> organization itself. . . . *Here, the idea for a Choose Life plate originated with the*
> *State, and the legislature determined that the plate will bear the message "Choose*
> *Life."*  The State thus exercises complete editorial control over the content of the
> speech on the Choose Life plate.  As a result, the second factor also weighs in favor
> of finding government speech.

*Rose*, 361 F.3d at 793; *see also Rose,* 373 F.3d 580, 586 (4th Cir. 2004) (reasoning that the speech

was hybrid but finding the government to be the "predominant speaker" because "the government

intended to express its own viewpoint, and it created a message to achieve that objective") (Shedd,

J., dissenting from denial of rehearing and rehearing *en banc*).  In short, despite various differences

of opinion between the members of the panel and the remainder of the court in addressing the

petition for rehearing *en banc*, *Rose* clearly establishes that license plates which are sponsored by

government officials and approved through the legislative process contain substantial elements of

government speech.[52]  It follows that it was clearly established in this circuit that license plates

created through a legislative process, particularly when there is no organizational request for the

---

[52] Adams argues that *Rose* is distinguishable from the present case because, unlike in *Rose*,
the state has not affirmatively taken the position that the purpose of the "I Believe" Act is "to
promote the State's preference."  Dkt. No. 117-1 at 8.  As discussed above regarding the claim for
injunctive relief, however, the purpose of the Act may best be determined from its content,
particularly given the absence of any legislative history.  That content suggests an intent to promote,
benefit, and endorse one specific religion, Christianity.  To the extent there are other external indicia
of purpose, those indicia are consistent with the purpose suggested by the text of the Act, although
they also suggest a desire on the part of the Act's promoters to curry favor with voters who identify
themselves as members of the Christian faith who, as Lt. Gov. Bauer repeatedly noted, constitute
the majority of voters in this state.

It is, moreover, logical to assume that the Legislature intends some level of consistency in
what it means when it passes a law, at least absent some evidence to the contrary.  Thus, given the
state's position in *Rose* that the Legislature intended the message found on its legislatively-
sponsored "Choose Life" plate to be the government's own message, it follows that, absent some
expression of intent to the contrary, it intended precisely the same for the legislatively-sponsored
"I Believe" plate.

plate, are subject to constitutional limitations on government speech including those set forth in the Establishment Clause.

The principal that the government may not encourage, promote, or endorse a particular religion through government speech was, likewise, clearly established well before the "I Believe" Act became law. *See, e.g.*, *Mellen*, 327 F.3d at 376 (finding state university's meal-time prayer violative of the Establishment Clause); *Constangy*, 947 F.2d at 1152 (finding use of prayer to open judicial proceedings violative of the Establishment Clause); *Hall v. Bradshaw,* 630 F.2d 1018, 1023 (finding inclusion of prayer on a state-issued road map violative of the Establishment Clause) (4th Cir. 1980).

It was, likewise, clearly established that display of religious symbols by the state constitutes "speech" or action in violation of the Establishment Clause absent a context which suggests that the intent is not religious. *See Allegheny*, 492 U.S. at 601-02 (finding display of crèche violative of the Establishment Clause). No such context exists in this case.

Five justices in *Allegheny* concluded that a crèche displayed by the grand staircase inside a county courthouse violated the Establishment Clause. *See Allegheny*, 492 U.S. at 601 (concluding the display of the crèche violated the Establishment Clause because, through its display, the county had "chosen to celebrate Christmas in a way that has the effect of endorsing a patently Christian message: Glory to God for the birth of Jesus Christ."). In reaching this conclusion, Justice Blackmun, speaking for the majority,[53] explained as follows:

> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits

---

[53] Some, but not all, portions of Justice Blackmun's opinion were joined by four other justices. Except where otherwise noted, the quotations herein come from those portions of the opinion.

government from appearing to take a position on questions of religious belief . . . .

492 U.S. at 593-94 (internal citations and quotation marks omitted).  He also noted that:

> Whatever else the Establishment Clause may mean (and we have held it to mean no
> official preference even for religion over nonreligion), . . . it certainly means at the
> very least that government may not demonstrate a preference for one particular sect
> or creed (including a preference for Christianity over other religions). The clearest
> command of the Establishment Clause is that one religious denomination cannot be
> officially preferred over another.

*Id.* at 605 (internal citations and quotation marks omitted); *see also id.* at 608-09 (noting the Court

had "expressly required strict scrutiny of practices suggesting a denominational preference, . . . in

keeping with the unwaivering vigilance that the Constitution requires  against any violation of the

Establishment Clause.") (internal citations and quotation marks omitted).

Warning of the risks posed by such endorsement, Justice Blackmun, still speaking for the

majority, noted:

> To be sure, in a pluralistic society there may be some would-be theocrats, who wish
> that their religion were an established creed, and some of them perhaps may be even
> audacious enough to claim that the lack of established religion discriminates against
> their preferences. But this claim gets no relief, for it contradicts the fundamental
> premise of the Establishment Clause itself. The antidiscrimination principle inherent
> in the Establishment Clause necessarily means that would-be discriminators on the
> basis of religion cannot prevail.

*Id.* at 611.

The five judges in the majority as to the unconstitutionality of the crèche split as to whether

a separate display of a Chanukah menorah which was placed outside the mayor's office next to a

Christmas tree and a sign saluting liberty was also unconstitutional.  Two of the justices concluded

that context saved this display while three found context insufficient to avoid Establishment Clause

concerns.[54]  A majority concluded that the menorah was permissible, although without a majority rationale.

While differences in their rationales led the five justices who agreed that the display of the crèche was unconstitutional to reach differing opinions as to the display of the menorah, those differences were because three of the justices would have applied a *more stringent* analysis. Applying any of these justices' rationales to the "I Believe" Act leads to the clear and inevitable conclusion that the Act is unconstitutional because it directs placement of a clearly sectarian religious symbol on state property (license plates), based on the sponsorship and approval of state officials (Lieutenant Governor and Legislature), without any context which would suggest mere accommodation, much less accommodation on equal terms with other religions.[55]

---

[54]  Albeit for somewhat different reasons, Justices Blackmun and O'Connor concluded that the display of the menorah was not unconstitutional because its context suggested that the combined display (menorah, tree, and sign) was intended as a recognition of liberty and religious diversity. *Id.* at 613-21 (Blackmun, J., joined by no others); 632-37(O'Connor, J., concurring, joined by no others).  The remaining three justices who joined the majority view as to the crèche concluded the display of the menorah *also* violated the Establishment Clause.  *Id.* at 637- 46 (Brennan, J., concurring) (joined by Marshall, J., and Stevens, J.); *Id.* at 646-55 (Stevens, J., concurring) (joined by Brennan, J., and Marshall, J.).  This was based, in part, on the view that the context (placement of the menorah by a Christmas tree) suggested establishment of a dual religion rather than a celebration of religious liberty.  As Justice Stevens noted in his concurrence:  "Plainly, the [Establishment] Clause as ratified proscribes federal legislation establishing a number of religions as well as a single national church."  These three justices also opined that "the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property."  *Id*. at 650-51.

[55]  The fact that the DMV (or Legislature before the DMV approval process was available) has approved other license plates *sought by* groups and organizations does not provide a context which could save the "I Believe" plate from unconstitutionality, even under the rationales adopted by Justices Blackmun and O'Connor.  This is because there is nothing in the "I Believe" Act or any other legislation which suggests that the purpose of the "I Believe" Act  was to encourage or allow diversity of religious expression.  To the contrary, the only arguably similar legislatively-approved plates are the "In God We Trust" and "God Bless America" plates.  To the extent these plates give context to the "I Believe" plate, it is a context which heightens, rather than diminishes, the Establishment Clause concerns.  This is because it suggests a movement towards theocracy – with

As noted above, four justices would have found both the display of the crèche and the menorah constitutional. In his dissent, which was joined by Chief Justice Rehnquist and Justices White and Scalia, Justice Kennedy advocated "diligent observance of the border between accommodation and establishment," and suggested that the latter is subject to two limitations including that: (1) the "government may not coerce anyone to support or participate in any religion or its exercise;" and (2) the government "may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact 'establishes a [state] religion or religious faith, or tends to do so.'" *Id*. at 659-60. He suggested three examples of the latter including: "taxation to supply the substantial benefits that would sustain a state-established faith, direct compulsion to observance, *or governmental exhortation to religiosity that amounts in fact to proselytizing*." *Id*. at 660 (emphasis added). Justice Kennedy further noted that "coercion need not be a direct tax in aid of religion or a test oath." *Id*. at 661. Instead, he acknowledged that "[s]ymbolic recognition or accommodation of religious faith may violate the Clause in an extreme case[.]" *Id.* He provided, as an example of such an extreme case, a city's "permanent erection of a large Latin cross on the roof of city hall," because "such an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion." *Id.*

The "I Believe" Act presents just such an "extreme case." First, it is reasonable to assume that there would be thousands of such plates sold, and, thus, that they would be both "obtrusive" and

---

the Legislature approving increasingly religious plates, progressing from the merely monotheistic (and arguably Judeo-Christian theme), to a singularly pro-Christian plate. For reasons previously discussed, the "In Reason We Trust" plate, so often mentioned in the briefs (and public appeals), provides no saving context for the "I Believe" Act because of the significant differences in how the two plates were obtained as well as their content.

"year-round" displays.[56] The symbolism is, likewise, clearly that of a "particular religion." *Id.* In addition, the means by which the Act was sponsored and approved (particularly in the absence of similar efforts for other religions and non-religious philosophies) demonstrates that the license plates are an "obvious effort to proselytize on behalf of a particular religion." To the extent there is any doubt as to the proselytizing intent or effect, at least as observed by a reasonable individual, it is erased by the post-injunction public comments of the Lieutenant Governor and Attorney General.

It takes little imagination or legal expertise to put the principles addressed above together and conclude that a state-sponsored message on a legislatively-created license plate which references only one religion constitutes a violation of the Establishment Clause. Thus, focusing on the "I Believe" Act itself, the court concludes that it was clearly established that this Act was unconstitutional on and prior to October 30, 2008, during which period Adams authorized her employees to design and post images of the proposed plate on the DMV's website and to make the images available through the media.

The inquiry does not, however, end there. This is because Adams is not responsible for the Act, but only its implementation. *See supra* n.30. Adams ceased implementation when the motion for a preliminary injunction was filed. By that point, she had authorized or directed an employee to design the plate, assumed the duty to create a marketing plan, and implemented that plan by posting the plate on the DMV's website and providing images to the media. The court, therefore, applies

---

[56] In his dissenting opinion, Justice Kennedy noted that "[t]he crèche and the menorah are purely passive symbols of religious holidays. Passersby who disagree with the message conveyed by these displays are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech." 492 U.S. at 664. License plates would not be so easily ignored given that their locations would be neither static nor limited and the impracticality of turning one's back on the vehicle ahead.

the qualified immunity analysis to these more limited actions, asking whether such actions violated a clearly established right. Although the correct answer is not entirely free from doubt, the court concludes that, under Fourth Circuit precedent, it must answer the question in the negative.

> As the Supreme Court has most recently explained, the doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

*Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 815 (2009) (internal citations and quotation marks omitted).

The Fourth Circuit applied this doctrine in the context of an Establishment Clause claim in *Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003). There, the court explained that, "a principle of constitutional law may be 'clearly established' even though the precise factual situation has never been presented to a court." 327 F.3d at 376. Accordingly, "'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The novelty of the circumstances presented is, however, a consideration. For example, in *Mellen*, the court struck down a practice which, effectively, required student participation in pre-meal prayers at Virginia Military Institute ("VMI"), a state-operated military college. The court noted the coercive atmosphere of the institution (particularly as to the freshmen) and, based on this atmosphere, found that "the Establishment Clause precludes school officials from sponsoring an official prayer, *even for mature adults*." 327 F.3d at 371-72 (emphasis added).

54

Despite finding that "in sponsoring an official prayer, VMI has *plainly* violated *Lemon*'s second and third prongs," the court found that the Superintendent of the school was entitled to qualified immunity, explaining as follows:

> Although the Establishment Clause plainly forbids public schools from sponsoring an official prayer for young children, the Supreme Court has never addressed the constitutionality of state-sponsored prayer in any university setting, much less in a military college. Indeed, some of our sister circuits have approved prayer at certain university functions. . . . In addition, the Court has not had the occasion to consider whether, or to what extent, the military may incorporate religious practices in its ceremonies. . . . . In these circumstances, [the Superintendent] could reasonably have believed that the supper prayer was constitutional, and we must affirm the district court's decision to award him qualified immunity.

*Mellen*, 327 F.3d at 376 (emphasis added) .

The court here is faced with an Act which plainly fails all three prongs of the *Lemon* test. Adams was, moreover, clearly aware of the constitutional challenge well before she took *any* action. Thus, she had a full opportunity to evaluate her legal footing and, in fact, made at least some effort to do so by consulting the DMV's General Counsel, although it is unclear whether she sought advice from him or the Attorney General as to the likelihood the Act would be held unconstitutional. This is significant because the high probability that the Act would be held to violate the Establishment Clause was not only predictable, but has been acknowledged in subsequent, public comments by the Attorney General.

As noted above, however, the court is not here evaluating whether it was clearly established that the *Act itself* was unconstitutional, but whether it was clearly established that Adams' actions in approving a design, adopting a marketing plan, and posting an image of the proposed plate on the DMV's website were violative of the Establishment Clause. This is a closer question than in *Mellen*, given that the unconstitutionality of the Act itself was clearly established as discussed

above.  Nonetheless, the undersigned concludes that Adams is entitled to qualified immunity.  In reaching this conclusion, the court has considered that, despite the predictability of the outcome of this action, there was no prior controlling precedent specifically addressing application of the Establishment Clause to a religious message on a legislatively-approved plate.  More critically, there was, to the court's knowledge, no precedent holding that actions *preliminary to distribution* of such a plate (such as the actions taken by Adams), without more, are violative of the Establishment Clause.[57]

## CONCLUSION

For the reasons set forth above, the court grants Plaintiffs' motion for summary judgment except as to the claim for damages asserted against Adams in her individual capacity.  Adams' motion for summary judgment is granted in part as to the individual capacity claim for damages only.  Defendants' motions are denied in all other respects.

**IT IS ORDERED AND ADJUDGED AS FOLLOWS:**

(1) That Section 56-3-10510 of the Code of Laws of South Carolina be, and hereby is,

---

[57] In reaching this conclusion, the court has given no weight to Adams' consultation with her General Counsel or claimed reliance on the Attorney General's defense of the constitutionality of the Act in his filings in this action. Dkt. No. 117-1 at 8,12. To the extent that reliance on legal advice may support a qualified immunity defense, it is only permitted when a defendant, despite violating clearly established law, proves the existence of "'extraordinary circumstances and . . . that he neither knew nor should have known of the relevant legal standard.'" *Buonocore v. Harris*, 134 F.3d 245, 252 (4th Cir. 1998) (quoting *Harlow*, 457 U.S. at 819).  As explained in *Buonocore*, "reliance on legal advice *alone* does not, in and of itself, constitute an 'extraordinary circumstance, sufficient to prove entitlement to the exception to the general *Harlow* rule." *Id.* at 253 (emphasis in original).  In any event, the advice given Adams by the DMV's General Counsel does not purport to address the constitutionality of the Act or Adams' actions.  Instead, it purports only to interpret the statute as to whether Adams had discretion to defer implementation. Valenta Aff. ¶ 6. Even that advice appears plainly in error given that the statute uses the word "may" in authorizing the DMV to issue an "I Believe" plate.

declared to be in violation of the Constitution of the United States of America;

(2) That Plaintiffs are entitled to attorneys' fees and costs, the amount of which shall be established on motion filed pursuant to Fed. R. Civ. P. 54 and Local Civil Rule 54.02;

(3) That Defendants Marcia S. Adams and Jon Ozmint and their officers, agents, servants, employees, attorneys and others acting with, through, or for Defendants be, and are hereby, permanently enjoined from all activities relating to the implementation of S.C. Code Ann. § 56-3-10510, including but not limited to (1) displaying or distributing images of the "I Believe" plate, (2) taking applications or deposit monies for the plates, (3) placing an order for production of the plates, (4) manufacturing the plates, or (5) issuing the plates; and

(4) That the Clerk of Court shall enter judgment accordingly.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
November 10, 2009